**Opinion issued January 23, 2014**



In The

# Court of Appeals

For The

# First District of Texas

_____

### NO. 01-13-00006-CR

_____

**JOEY DWAYNE JONES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 122nd District Court**
**Galveston County, Texas**
**Trial Court Case No. 11CR3528**

## O P I N I O N

A jury convicted appellant, Joey Dewayne Jones, of the second-degree

felony offense of indecency with a child and assessed punishment at ten years'

confinement.[1] In two issues, appellant contends that (1) the State failed to present sufficient evidence that he touched the complainant's genitals, as alleged in the indictment, and (2) the trial court erroneously assessed attorney's fees for his court-appointed attorney against him.

We modify the judgment of the trial court and affirm as modified.

## Background

In the summer of 2011, Sandtesia Hudson needed someone to watch her four-year-old daughter, the complainant, O.H., while she was at work. While at work one day, she met Roberta Jones Swearington, who noticed that Sandtesia appeared distressed and asked her what was wrong. After Sandtesia explained her childcare dilemma, Roberta first offered to contact one of her relatives. That individual was not able to watch O.H., so Roberta, who acted as the caretaker for her elderly mother, offered to take care of O.H. as well while Sandtesia was at work. Roberta watched O.H. for approximately three months without incident, and both Sandtesia and O.H. had a good relationship with her.

Appellant moved in with Roberta, his older sister, in 2011. Sandtesia testified that she and O.H. had met appellant on several occasions and that O.H. knew appellant as "Peanut." On November 14, 2011, Roberta called Sandtesia in the morning, before Sandtesia had dropped O.H. off at Roberta's house, and told

---

[1] *See* TEX. PENAL CODE ANN. § 21.11(a)(1) (Vernon 2011).

2

her that she needed to take her mother to the hospital. Roberta assured Sandtesia that she would not be gone long and that appellant would be at the house and could watch O.H. Sandtesia dropped O.H. off at Roberta's house around 2:00 p.m.

Sandtesia picked O.H. up after her shift ended around 11:30 p.m. O.H. was watching television when Sandtesia arrived, and she testified that nothing about O.H.'s behavior appeared out of the ordinary. O.H. waved to appellant and told him "bye" before getting in Sandtesia's car. Sandtesia testified that, normally, when she drove O.H. home, they would talk about what she did that day and whether she behaved for Roberta. This evening, when Sandtesia asked O.H. how her day had been, O.H. replied, "I didn't do anything." Sandtesia asked, "You didn't do anything the whole day?" O.H. started crying in response. Sandtesia testified that this response was "very unusual because [O.H. is] always ready to tell [Sandtesia] how exciting her day was and what [she] and [Roberta] did."

O.H. then stated, "If I tell you, you're going to be mad at me," and Sandtesia reassured her that she would not get mad, but she needed to know what had happened. O.H. told Sandtesia that she and appellant were "playing—doing grown stuff." Sandtesia testified that O.H. told her that they were "doing things that grown-ups should do," specifically, appellant touched her "in her private area, her poopah" and kissed her. O.H. elaborated that appellant had picked her up, wrapped her legs around him, and sat down on the couch so that O.H. was sitting

3

on his lap.  O.H. told Sandtesia that appellant then laid her on her back and kissed her, both on her mouth and on her neck, and then touched her "poopah," which was the phrase that O.H. used to refer to her vagina.  O.H. clarified that appellant touched her over her clothes.

Sandtesia stressed the importance of telling the truth and asked O.H., "Are you sure this happened?"  O.H. responded, "Yes."  Sandtesia asked O.H. why she did not tell Roberta what had happened when she arrived back at the house, and O.H. responded, "Because he told me not to tell.  It was a pinky promise or he would get me."  Sandtesia had never heard O.H. speak of "pinky promises" before that night.  Sandtesia testified that O.H. was crying and scared while she related this information.

Instead of continuing home, Sandtesia immediately drove O.H. to the League City Police Department ("LCPD") and explained to an officer what O.H. had told her.  Sandtesia later took O.H. for a forensic interview at the Child Advocacy Center.  The State did not offer the tape of that interview for admission into evidence.

O.H., who was six years old at the time of trial, also testified.  Before her testimony, the trial court briefly questioned her to make sure that she knew the difference between a lie and the truth.  O.H. stated that she would tell the truth, "what really happened," while she testified.  O.H. testified that she remembered

4

staying at Roberta's house and that she liked Roberta. She also testified that she remembered appellant, whom she referred to as Peanut, and she identified him in court. The State showed O.H. an anatomically correct diagram and asked O.H. to identify several body parts. When the State pointed to the diagram's private area, O.H. agreed that she called it the "poopah." When asked where appellant touched her, O.H. pointed to the diagram's private area and stated that she did not "feel comfortable saying" the name of it. She testified that appellant touched her with his hands and that he did not touch her anywhere else. She also agreed that appellant kissed her, but she did not "feel comfortable" saying where on her body he had kissed her.

On cross-examination, O.H. testified that Sandtesia told her that appellant was going to be present at the trial, but that she did not tell her "what [she] should talk about." O.H. stated that she did not know why she never went back to Roberta's house and that something happened the last time she was there, but she did not "feel comfortable saying it." She stated that she told Sandtesia what had happened to her, but she did not tell Roberta because she was scared. She did not feel comfortable relating what she had told Sandtesia to the jury. The following exchange occurred between O.H. and defense counsel:

[Defense counsel]: Has your mom talked to you about this a lot, why you're here today?

[O.H.]:  Yes.

[Defense counsel]: How long has she been talking to you about it, for?

[O.H.]: I don't know.

[Defense counsel]: Does she talk to you about what you were supposed to say?

[O.H.]: (Nods head up and down)

[Defense counsel]: She did talk to you about what you were supposed to say?

[O.H.]: Yes.

[Defense counsel]: Did she tell you what you were supposed to say?

[O.H.]: Yes.

LCPD Detective M. Grant was assigned this case after Sandtesia made a complaint against appellant. Detective Grant observed O.H.'s forensic interview, but he did not take part in this interview, and he never directly spoke with O.H. After the forensic interview occurred, Detective Grant spoke with Roberta, appellant, and appellant's aunt. Both Roberta and appellant confirmed that appellant was alone with O.H. on the day of the incident. In this interview, appellant told Detective Grant that he did not touch O.H. Roberta and appellant's aunt both informed Detective Grant that they did not believe appellant had committed the offense and that they believed Sandtesia and O.H. were lying.

Detective Grant interviewed appellant a second time a few weeks later. Although appellant came in for an interview voluntarily and the interview was non-custodial, Detective Grant read appellant the *Miranda* warnings before proceeding with the interview. Appellant indicated that he understood these rights.

6

In this interview, appellant admitted to touching O.H. Appellant also stated, "That girl, she's something else." Detective Grant understood that statement to mean that appellant was sexually attracted to O.H. The trial court admitted video recordings of both of these interviews, and the State played them for the jury while Detective Grant testified.

On cross-examination, Detective Grant stated, "I've not seen a 5-year-old be so specific as to what the allegations were and then have the suspect confirm what the child is saying." He reiterated several times that, in the second interview, appellant "corroborated what the child had said." Detective Grant agreed with defense counsel that appellant was cooperative during the second interview, but he did not agree that appellant made a false confession during this interview.

Roberta testified that appellant was alone with O.H. from around 2:00 p.m. to 4:15 p.m. when she returned from the hospital with their mother. Roberta did not notice anything unusual about O.H. or her behavior, and O.H. did not tell Roberta that anything had happened to her earlier in the day. Roberta testified, "Being with [O.H.] for several hours, I would have noticed something." She further testified, "[E]ven still to this day I'm still shocked by the allegations, you know, that's made against my brother because my brother's not that type of person." Roberta also stated that, when appellant went to the police station for the second interview, he was "upbeat, [in a] good mood, [and] had nothing to hide,"

7

but when he came out of the second interview, his demeanor was the "[t]otal opposite" and he was "a little upset" and depressed. Roberta testified that she was surprised that appellant had confessed and that appellant might have agreed with the officers that he committed the offense "[i]f he was under duress."

Appellant testified on his own behalf. He testified that he used to flirt with Sandtesia, but both of them started seeing other people. He stated that after he started seeing someone else, Sandtesia's attitude towards him "just switched up and changed a little bit" and she "just looked more upset." Appellant confirmed that he was alone with O.H. on the day of the incident, but he denied touching her inappropriately. Appellant testified that when Sandtesia picked O.H. up and O.H. said "bye" to him, Sandtesia slapped her on the back and marched her out to her car. Appellant speculated that Sandtesia was mad about seeing him with his girlfriend, who was over at Roberta's house when Sandtesia picked up O.H.

Appellant acknowledged that he made a statement confirming the allegations against him in the second interview with Detective Grant, but he testified that he felt threatened and "like [he] was pushed to sign that paper." He did not feel that he was free to leave at the time, and "[he knew he] shouldn't have signed [any] papers, but [he] did." He stated that he felt "very pressured" at the time Detective Grant questioned him and that that was "the only reason" he signed a confession.

8

The jury found appellant guilty of the offense of indecency with a child and assessed punishment at ten years' confinement. In the written judgment, the trial court, which had found appellant indigent at the outset of the case and appointed counsel to represent him, ordered appellant to pay attorney's fees in an amount "to be assessed." "To be assessed" was handwritten on the judgment. The judgment did not include a finding that appellant's financial circumstances had changed such that he was capable of paying, in whole or in part, the fees incurred in his defense. Appellant subsequently filed a second pauper's oath and requested that the trial court appoint appellate counsel for him. The trial court did so in a notice informing appellate counsel that he had "been appointed to represent the following indigent defendant," and this appeal followed.

## Sufficiency of the Evidence

In his first issue, appellant contends that the State failed to present sufficient evidence that he touched O.H.'s genitals, as alleged in the indictment.

### A. Standard of Review

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that

9

*Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (stating jury can choose to disbelieve witness even when witness's testimony is uncontradicted). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's credibility determinations. *See Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

## B.     *Indecency with a Child by Contract*

To establish the offense of indecency with a child by contact, the State had to demonstrate that appellant engaged in sexual contact with O.H., a child younger than seventeen years of age.  *See* TEX. PENAL CODE ANN. § 21.11(a)(1) (Vernon 2011).  In this case, "sexual contact" is defined as touching O.H.'s genitals with the intent to arouse or gratify appellant's sexual desire.  *See id.* § 21.11(c)(1) (specifying that touching child "through clothing" constitutes "sexual contact").

A child sexual abuse victim's uncorroborated testimony is sufficient to support a conviction for indecency with a child.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.07 (Vernon Supp. 2013); *Martinez v. State*, 178 S.W.3d 806, 814 (Tex. Crim. App. 2005) (noting that article 38.07 "deals with the *sufficiency* of evidence required to sustain a conviction for" certain sexual offenses) (emphasis in original). The State has no burden to produce any corroborating or physical evidence. *Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004) (holding that medical or physical evidence is not required to corroborate child victim's testimony), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). Likewise, a child victim's outcry statement alone can be sufficient to support a sexual abuse conviction.  *See Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.— Dallas 2002, pet. ref'd).

11

Courts give wide latitude to testimony provided by child victims of sexual abuse. *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi 2008, no pet.). We liberally construe this testimony, and, as long as the child communicates to the jury that the touching occurred on a part of the body within the definition of the statute, the evidence will be sufficient. *Lee*, 176 S.W.3d at 457; *see Gonzalez Soto*, 267 S.W.3d at 332 ("The victim's description of what happened to her need not be precise, and she is not expected to express herself at the same level of sophistication as an adult."). The requisite intent for the offense of indecency with a child can be inferred from the defendant's conduct and remarks and all of the surrounding circumstances. *See Gonzalez Soto*, 267 S.W.3d at 332; *Navarro v. State*, 241 S.W.3d 77, 79 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

Here, O.H. testified at trial with the aid of an anatomically correct diagram. When the State pointed to the genital area of the diagram, O.H. agreed with the State that she called that area "poopah." When asked where appellant touched her, O.H. pointed to that same area, but stated that she did not "feel comfortable" verbalizing what that area was called. She specified that appellant touched her with his hands and that he also kissed her. She identified appellant in court. O.H.'s testimony alone is sufficient to support appellant's conviction for indecency with a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a); *see Martines*, 371

12

S.W.3d at 240 (holding that State is not required to present corroborating or physical evidence).

Sandtesia also testified at trial concerning O.H.'s outcry statement. She testified that, while she was driving O.H. home on the night of the incident, O.H. started crying when asked what she had done at Roberta's house that day. Eventually, O.H. told Sandtesia that she and appellant played a game involving "grown stuff," during which appellant picked her up, wrapped her legs around him, and sat down on the couch. He then laid her on her back, kissed her, and touched her genital area over her clothes. O.H. told Sandtesia that she was telling the truth about what had happened and that she did not tell Roberta what had happened because appellant made her "pinky promise" that she would not tell anyone "or he would get [her]." Sandtesia's testimony regarding O.H.'s outcry statement is also sufficient, standing alone, to support appellant's conviction. *See Tear*, 74 S.W.3d at 560.

Furthermore, in addition to both O.H.'s and Sandtesia's testimony, the trial court also admitted the video recordings of appellant's interviews with Detective Grant. During the second interview, appellant admitted to touching O.H. inappropriately and stated, "That girl, she's something else." At trial, appellant testified on his own behalf and stated that he did not touch O.H. and that he was pressured by Detective Grant into confessing. It is the province of the jury to

13

weigh this conflicting evidence, and we resolve any inconsistencies in the evidence in favor of the verdict. *See Williams*, 235 S.W.3d at 750 (holding that we do not re-evaluate weight and credibility of evidence when reviewing sufficiency of evidence); *Curry*, 30 S.W.3d at 406 (holding that we resolve inconsistencies in evidence in favor of verdict).

On appeal, appellant presents no argument for why the evidence is insufficient other than pointing to O.H.'s exchange with defense counsel on cross-examination, during which she agreed with defense counsel that she and Sandtesia had talked about what she was supposed to say while testifying and that Sandtesia "[told her] what [she] was supposed to say," and arguing that "it cannot be concluded that a rational trier of fact could have found beyond a reasonable doubt" that appellant committed the offense.

Appellant appears to argue that, based on this exchange with defense counsel, the jury could have inferred that O.H. was not testifying as to what actually happened but instead as to what Sandtesia told her to say. O.H. was four years old at the time of the offense and six years old at the time of trial. It is at least an equally reasonable inference from the evidence that Sandtesia would have spoken with O.H. about the trial and the general nature of what she would need to talk about in front of a group of strangers, a topic that, it is clear even from the appellate record, made O.H. extremely uncomfortable. *See Hooper v. State*, 214

S.W.3d 9, 14 (Tex. Crim. App. 2007) ("Juries are permitted to make reasonable inferences from the evidence presented at trial . . . ."). When the record supports conflicting inferences, we presume that the fact finder resolved the conflict in favor of the prosecution and defer to that determination. *See Clayton*, 235 S.W.3d at 778. Moreover, in convicting appellant, the jury clearly found O.H.'s and Sandtesia's testimony credible, and we defer to that credibility determination. *See Lancon*, 253 S.W.3d at 705.

We therefore conclude that, when viewing the evidence in the light most favorable to the verdict, the State presented sufficient evidence to support appellant's conviction for indecency with a child by contact.

We overrule appellant's first issue.

## Attorney's Fees for Court-Appointed Defense Counsel

In his second issue, appellant contends that the trial court erred in assessing attorney's fees for his court-appointed counsel against him because he was indigent at the outset of the case, and the State presented no evidence that his financial circumstances had changed during the pendency of the case.

Counsel appointed to represent a defendant in a criminal proceeding shall be paid a reasonable attorney's fee for performing certain services. TEX. CODE CRIM. PROC. ANN. art. 26.05(a) (Vernon Supp. 2013). Code of Criminal Procedure article 26.05(g) provides:

15

> If the court determines that a defendant has financial resources that enable him to offset in part or in whole the costs of the legal services provided, including any expenses and costs, the court shall order the defendant to pay during the pendency of the charges, or, if convicted, as court costs the amount that it finds the defendant is able to pay.

*Id.* art. 26.05(g). A defendant who is determined by the trial court to be indigent is presumed to remain indigent for the remainder of the proceedings unless a material change in the defendant's financial circumstances occurs. *Id.* art. 26.04(p) (Vernon Supp. 2013). "[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees." *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010). Thus, in the absence of any indication in the record that the defendant's financial status has in fact changed, the evidence will not support the imposition of attorney's fees. *Wiley v. State*, 410 S.W.3d 313, 317 (Tex. Crim. App. 2013). When a trial court fails to find that the defendant's financial circumstances changed after initially finding the defendant to be indigent, the record is insufficient to support the order to pay attorney's fees. *See id.*; *Johnson v. State*, 405 S.W.3d 350, 354 (Tex. App.—Tyler 2013, no pet.).

Here, there is no evidence in the record indicating that appellant's financial circumstances materially changed after the trial court initially determined that he was indigent and appointed counsel to represent him. *See* TEX. CODE CRIM. PROC. ANN. art. 26.04(p); *Johnson*, 405 S.W.3d at 355. After the trial court entered

16

judgment, appellant filed a second pauper's oath and requested that the trial court appoint counsel for an appeal. The trial court, again finding that appellant was indigent, did so. The trial court did not make a finding in the judgment that appellant had financial resources enabling him to offset, in whole or in part, the costs of the legal services provided to him. *See* TEX. CODE CRIM. PROC. ANN. art. 26.05(g); *Johnson*, 405 S.W.3d at 355; *see also Wiley*, 410 S.W.3d at 317 ("In this case, because the trial court failed to find that the appellant's financial status changed after initially finding the appellant to be indigent, the record is insufficient to support the order to pay the attorney fees stemming from his court appointed representation during the initial plea proceedings."); *Cates v. State*, 402 S.W.3d 250, 251–52 (Tex. Crim. App. 2013) ("Here, Appellant had been determined by the trial court to be indigent and there was never a finding by the court that he was able to re-pay any amount of the costs of court-appointed legal counsel. Thus, there was no factual basis in the record to support a determination that Appellant could pay the fees.").

We conclude that the evidence is insufficient to support the order requiring appellant to pay the attorney's fees for his court-appointed defense counsel. *See Cates*, 402 S.W.3d at 251–52; *Johnson*, 405 S.W.3d at 355. We therefore modify the judgment of the trial court to delete the assessment of attorney's fees against appellant.

We sustain appellant's second issue.[2]

## Conclusion

We modify the judgment of the trial court to delete the assessment of attorney's fees against appellant. We affirm the judgment of the trial court as modified.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Publish. TEX. R. APP. P. 47.2(b).

---

[2] The State contends that this issue is not ripe for consideration because no specific dollar amount of attorney's fees has been assessed against appellant. Although the State is correct that the trial court has not determined the precise amount of attorney's fees that appellant should pay, it determined in its written judgment that appellant is responsible for attorney's fees and ordered appellant to pay attorney's fees. This issue, therefore, is ripe for consideration by this Court.