

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00420-CR

SAMUEL ROCHELL MADISON                                    APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY
TRIAL COURT NO. 1407727D

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In one issue, appellant Samuel Rochell Madison appeals one of his three convictions for indecency with a child by contact, arguing that the evidence is insufficient to support that one conviction. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Background

Girl,[2] who was eleven years old at the time of the bench trial, testified that when she was roughly eight years old, she, her brother, and her mother (Mom) lived with Mom's boyfriend Madison in a two-bedroom apartment. Girl said that she did not like living with Madison. Although she was initially reluctant to say why, Girl eventually recounted how, when the two were alone, Madison would intentionally touch her over her clothes with his hand in the area where she urinates from.

When asked how many times this had happened, Girl first responded "I don't remember." When asked whether it had happened "one time or many times," Girl said "[m]any times." But Girl said that she could not remember how many times. When asked if it had happened more than ten times, Girl said "I don't know." Girl said that the touches occurred when she was in Madison's room, and that although it had not occurred every time she would go in his room, she agreed it had happened on different occasions. When asked specifically if it had happened more than once, Girl said "More than once."

By Girl's account, she did not initially tell Mom when this first started happening because she was "scared," but later she disclosed to Mom what had been happening. Girl averred that after she told Mom, Mom told her they would

---

[2]We use aliases when possible to protect the minor child's identity in this case.

be moving out the next morning. Girl said that she was relieved to know she would no longer be around Madison.

On cross-examination, Girl said that Madison sometimes touched her in this manner when Mom was in the apartment, but other times when she was not. Specifically, Girl said that Mom was either "somewhere in the house or at work or out grocery shopping or . . . ." But Girl was not allowed to finish her answer before defense counsel posed another question to her. When asked whether this had occurred when she and Madison were wrestling, Girl said "I can't remember."

Mom testified that she met Madison, a neighbor in her apartment complex, in November 2013. According to Mom, after she and Madison became friends, their relationship evolved into a romantic one and eventually she and Girl moved in with Madison.[3] Mom stated that at first, Girl and Madison got along wonderfully and that they "hung out constantly." By Mom's account, Madison lavished Girl with gifts, including "My Little Ponies, video games, [and] a bird" and he even "made like a whole little My Little Pony fortress" for her in his bedroom, which he initially shared with Mom.

Mom averred that after a few months she realized that she and Madison were incompatible and that the two had decided to stop seeing each other romantically but had remained friends. Mom testified that one day Girl did not

---

[3]Mom's and Madison's testimonies indicate that Mom's son would visit regularly and that these visits increased in the summer.

want to come out of her room because she said that she was "sad" and that the following day Girl asked that her stuff be moved out of Madison's room and into her own. Mom also noticed that Girl's demeanor had changed. After Girl once again remained in her room all day, Mom went to her and asked if something had happened—Girl said only that she "just [did not] feel good."

In late October 2014, just after Mom had come home from work, Girl went to her and said, "You know how you talked to me[,] mom[,] about why I'm sad?" After Mom acknowledged the conversation, Girl said that Madison made her uncomfortable and that he would touch her on her "privates." Specifically, Mom alleged that Girl told her that she "didn't notice at first" because she thought "he was just accidentally doing it when [she and Madison] played . . . But he does it now even when we're not playing, even when we're not wrestling." Mom said that she could not get any more information from Girl and that Girl shut down on her and said that she did not want to talk about it anymore. When asked whether Girl indicated that these touches seemed "like it was something that just happened one time," Mom replied "No, no."

Mom said that she did not confront Madison that evening when he came home from work and that after he left for work the next morning, she and her former sisters-in-law moved her, Girl's, and her son's things out in under two hours. Mom, who had less than $40 at that point, moved in temporarily with a friend. Later that day, Mom called the Department of Family and Protective Services and reported what Girl had told her.

4

Girl's Aunt testified at trial as well. Aunt described how on October 27, 2014, Mom called her very distressed. Specifically, Aunt said that Mom called her to say that Girl had just told her that Madison had been touching Girl inappropriately and to say that she needed to move out of the apartment right away. Aunt described how she and Mom discussed and then executed a plan to move all of Mom's and Girl's belongings out of the apartment the next morning immediately after Madison left for work.

Donovan Boswell testified that the Department assigned her to investigate Girl's case after Mom's call. Boswell said that she "screen[ed]" Girl a few days after the call and that during the interview Girl initially "kind of opened up a little bit," but that as the interview went on and began to delve into the indecent contact, Girl "became more . . . withdrawn." Specifically, Boswell said that it appeared as though Girl did not want to talk about the allegations but that she did eventually describe the indecent contact. Girl told Boswell that Madison had touched her over her clothes and on her vaginal area and that he had done it more than once. After learning the details of the abuse, Boswell contacted Detective Tony Miller of the Haltom City police. From there, Boswell coordinated and attended a forensic interview of Girl. Miller also attended the interview.

During cross-examination, Boswell acknowledged that her notes indicated that both Mom and Girl had reported that Madison had touched Girl "several times over clothes while they were wrestling around." Boswell acknowledged, however, that she did not remember Girl stating that these events occurred while

5

"wrestling," but Boswell averred that she gathered that information from the Department's forensic interview request. Donovan could not remember if the term "wrestling" appeared in her own report.

Miller testified that in addition to attending the forensic interview, which he described as "consistent" with the report he had received regarding Girl's outcry, he also interviewed Madison at the police station. The State published a video of the interview for the trial judge. In the video, Miller tells Madison that the reason he was there was because Girl had alleged that he had touched her "on her private area, over the top of her clothes, on more than one occasion." In the video, Miller can also be heard telling Madison that what Girl had reported was more than just "touching" but rather that Madison had been "rubbing" . . . "her with [his] hand on her vagina over her clothes." In response to this, Madison stated that Mom had described Girl as a "vicious liar" and that her lying may in part be the reason she had made her outcry. The video also reveals Madison stating that Mom may have had Girl make up the outcry because he had refused Mom's advances a few nights before and that she wanted a reason to move out of the apartment suddenly without having to fulfill her commitment to their lease and having to pay restoration for damage her dog had caused to Madison's entertainment center. Later in the interview, Madison stated that he believed perhaps some sort of "accident" between him and Girl must have occurred.

Lindsey Dula, director of program services and a forensic interviewer for the Alliance for Children, testified as well. Dula said that during her interview,

6

Girl would generally be talkative and engaging regarding neutral subjects but that when Dula would question her about the allegations, her demeanor would change to being more subdued.

Marx Madison, Madison's brother, testified for the defense. Marx averred that Madison, three of his children, and Girl had attended a Madison family reunion the summer prior to these allegations and that Girl acted as though she trusted Madison and felt comfortable around him. He also said that he had no reservations about Madison being around children.

Madison testified in his own defense. Regarding how he and Mom came to live together, Madison testified to much of the same narrative that Mom testified to. Like Mom, Madison described an exuberant child who liked to play with her toy ponies and watch TV in the couple's bedroom. Madison also said that Girl would sometimes sleep in the bed at night between the couple.

Madison averred that once Mom's son began to spend more time at the apartment during the summer months, Girl moved half of her ponies into her own bedroom that she shared with her brother. Eventually, according to Madison, he and Mom broke off their romantic relationship and Mom began to stay in the same room as Girl and Mom's son.

Madison explained that after he had purchased a parakeet for Girl, Mom purchased a large dog for her son. By Madison's account, the dog chewed on his expensive furniture and this upset him. After having shown the damage to Mom, Madison said that he remained upset. Shortly after, according to Madison,

7

Mom got "all dressed up" one evening, came into his bedroom, locked the door, and asked him to have sex with her. Allegedly, he rejected her because he was still upset about the furniture, and this caused Mom to cry and leave the room while slamming the door. Madison said that he "knew there was something coming after that."

Madison further testified that he believed that the allegations of him having touched Girl inappropriately had come from Mom because he had "humiliated" Mom when he rejected her advances. Madison described himself as a man of faith, but he asserted that Mom was a professing "witch."

Madison also said that Girl's behavior never changed toward him while she lived with him and that she was always "a very happy well-adjusted child." Madison averred that he spent less time with Girl during the last days that she lived in the apartment because Mom had "pulled her kids back behind the door" of Girl's bedroom. Madison said that he never touched Girl inappropriately and that Girl was "lying."

The State called three rebuttal witnesses, all of whom had been Girl's teachers in the recent past. All three averred that Girl was a smart, responsible, disciplined, and truthful child.

The trial court found Madison guilty of all three counts of indecency with a child by contact and assessed punishment at ten years' confinement. This appeal followed.

8

### III. Discussion

In one issue, Madison argues that the evidence is insufficient to support more than two of his three convictions for indecency with a child by contact. Specifically, Madison argues that the prosecutor should not have been allowed to limit a question he posed to Girl by offering what he refers to as a leading question: whether Madison had made indecent contact with Girl "one time or many times." Moreover, Madison argues, that "many" does not necessarily mean more than twice and thus the evidence is insufficient to support three indecent contacts. We disagree.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an

9

evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific

element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

## B.      Indecency With a Child By Contact

A person commits the offense of indecency with a child if, among other things, he touches the genitals of someone younger than seventeen years of age with the intent to arouse or gratify the sexual desire of anyone.  Tex. Penal Code Ann. § 21.11(a)(1), (c)(1) (West Supp. 2017).   Touching a child through her clothing is encompassed by the offense.  *Id.*  The required intent may be inferred from the surrounding circumstances.  *Navarro v. State*, 241 S.W.3d 77, 79 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).  And the uncorroborated testimony of either the child or an outcry witness suffices to support a conviction for indecency with a child.  *Jones v. State*, 428 S.W.3d 163, 169–70 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

Here, viewing the evidence in a light most favorable to the trial court's rulings, the record evidence establishes that the indecent contact occurred on more than two occasions.  Girl reported to Mom that she "didn't notice at first" when Madison began to touch her "privates" and that she believed "he was just accidentally doing it when" she and Madison "played," but that at the time of her outcry, "he [did] it now even when [they were] not playing, even when [they were] not wrestling."  It is a reasonable inference from Girl's outcry that the indecent contact had happened more than once when the two had "played" or "wrestle[d]."

11

And it is directly evident that it began to occur "even when" the two were not playing or wrestling. Thus, Girl's own outcry was sufficient to establish that Madison's indecent contact occurred on more than two occasions. See *Jones*, 428 S.W.3d at 169.

Furthermore, Girl testified that the indecent touching had occurred "[m]any times." A reasonable inference from this testimony is that the indecent contact occurred more than twice. Even assuming, as Madison argues, that it is also a reasonable inference from the testimony that "many" might only mean twice, we must presume that the trial court resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Murray*, 457 S.W.3d at 448–49.

But Girl's testimony is not the only evidence from which a reasonable inference can be made that the indecent contact happened on more than two occasions. Boswell testified, in direct response to repeated questions posed by defense counsel, that both Mom and Girl had reported that Madison had touched her "several times over [her] clothes while they were wrestling around." Even if this court were to strain the meaning of "many" and "several" as to mean only two, as Madison has suggested, this evidence coupled with Girl's outcry that it happened "now even when [she and Madison were] not playing [or] wrestling" would mean that the indecent contact had occurred more than once while they were playing or wrestling and at least one other time when they were not. Thus, the evidence supports that the indecent contact occurred on at least three occasions.

We also note that even though Madison now complains that the prosecutor's question to Girl of whether the indecent contact had happened "one time or many times" was a leading question, Madison did not object to the prosecutor's question at trial. *See* Tex. App. P. 33.1. More significantly, defense counsel is the one who elicited testimony that the indecent contact had occurred "several times . . . while [Girl and Madison] were wrestling around."

We hold that the trial court could have found beyond a reasonable doubt that Madison touched Girl, someone younger than seventeen years of age, over her clothes, on her genitals, with the intent to arouse or gratify his sexual desire and that this indecent contact occurred at least three times. *See* Tex. Penal Code Ann. § 21.11(a)(1), (c)(1); see also *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599. Thus, we overrule Madison's sole issue on appeal.

## IV. Conclusion

Having overruled Madison's sole issue on appeal, we affirm the trial court's judgments.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: SUDDERTH, C.J.; MEIER and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 5, 2018

13