**Affirmed and Memorandum Majority Opinion and Concurring Opinion filed May 11, 2023.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-21-00632-CR

---

**GIOVANNY RANCOCO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1583707**

---

## MEMORANDUM OPINION

Appellant Giovanny Rancoco appeals his conviction for aggravated sexual assault of a child under the age of fourteen, a first-degree felony. *See* Tex. Penal Code Ann. § 22.021(a). In what we construe as two appellate issues, appellant argues that: (1) there was legally and factually insufficient evidence to support his conviction; and (2) he is entitled to a factual sufficiency review in this case. We affirm.

# I.    BACKGROUND

On May 30, 2018, appellant Giovanny Rancoco was indicted for sexual assault of Y.M., a child under the age of fourteen at the time of the offense. The indictment alleged that on August 23, 2017, Rancoco caused contact between his sexual organ and Y.M.'s anus. *See id.* § 22.021(a)(1)(B)(iv), (a)(2)(B). In June 2021, the case went to trial, but the jury could not unanimously agree on a verdict so the trial court declared a mistrial. In October 2021, the case was re-tried. Below is a summary of the relevant testimony from the second trial.

## A.    Y.M.'s Mother's Testimony

Y.M.'s mother ("Mother") testified that she hired Patricia Lopez ("Patty")—appellant's wife—to babysit Y.M. Mother claimed that she would ask Patty to babysit Y.M., and sometimes Y.M.'s brother, when Mother and Y.M.'s father both worked. Mother testified that after a while, Y.M. told her that she did not want to go to Patty's house anymore. At first, Y.M. told her that Patty would not give her food, but when Mother asked her to "tell the truth," Y.M. told her that appellant would touch her "little thing," referring to her vagina. Mother admitted that although Y.M. disclosed the alleged abuse on a Friday, she did not initially take Y.M. to the hospital: "I just wanted to make sure that what she was saying was the truth . . . for me to really believe that [appellant] was capable of doing those type of things. I trusted—I trusted them a lot."

Initially, Y.M. told Mother about an incident that had occurred in appellant's living room, but over the next few days, Y.M. told Mother about other alleged incidents of sexual abuse in other parts of appellant's home, including the bathroom, kitchen, and closet. Mother eventually decided to take Y.M. to the hospital for an evaluation of sexual abuse.

**B.    Y.M.'s Testimony**

Y.M. was ten years old when she testified at trial. Y.M. testified that she and her father would see appellant in the morning when she was dropped off for babysitting; according to Y.M., appellant would leave for work around 1:00 p.m. and work for three or four hours. She described five instances of sexual abuse allegedly committed by appellant against her in five different locations in appellant's apartment: the living room, kitchen, closet, bathroom, and bedroom. Y.M. testified that in the living room, appellant would touch her chest and genitals over her clothes while she was watching a movie. Y.M. claimed that if anybody else was around, appellant would "act normal", but when nobody else was around, he would put his hand on her vagina, at first "over [her] clothes [but] then he went inside." Y.M. further testified that appellant was frequently touching his own penis while fondling her.

In the kitchen, Y.M. testified that appellant would sit her on the counter and then begin kissing her neck. According to Y.M., appellant would tell her the same thing he always told her: to stay calm and quiet. Y.M. also asserted that appellant would sometimes surprise her in the closet by hugging her and kissing her from behind.

Y.M. testified about an incident of sexual abuse that occurred in the bathroom: "I locked the door and I heard the doorknob move and then I wanted to wipe myself very quickly and pull my pants up but it was too late because he walked in and he pulled my pants down." In court, Y.M. demonstrated how appellant made her bend over the bathtub on her knees while he pulled down his pants. According to Y.M., appellant wanted to put his penis "inside where I do my poo poo." Y.M. testified that his penis touched her butt and it caused her so much pain that she wanted to cry, but afterward, he was angry and threw the door hard, exclaiming "it did not fit."

Y.M. described another incident where appellant told her, "Follow me or I will tell your father you misbehaved." Appellant led Y.M. to his bedroom, had Y.M. face the wall, and then told her not to turn around. Nevertheless, Y.M. turned around and saw appellant touching his penis when a white cream came out.

## C.     Guillermo Suarez's Testimony

Guillermo Suarez testified that he was the on-call ER physician at Memorial Hermann Southwest when Y.M and Mother visited. He testified that the medical records indicated that the examination found that Y.M.'s hymen was intact and that there was no trauma to Y.M.'s external genitalia. Suarez also testified that it was normal that no biological matter was collected because Y.M. was first brought to the hospital more than ninety-six hours after the alleged incident and it is unlikely to find biological matter outside the initial ninety-six hour window.

## D.     Maurice Guerrero-Escot's Testimony

Detective Maurice Guerrero-Escot testified that she was called to the hospital to interview Y.M. She asserted that the majority of cases she investigated involved disclosures of sexual abuse that occur weeks, months, or years after the alleged abuse. She also agreed that it is quite common for the examination to show that "everything's pretty normal."

## E.     Reena Isaac's Testimony

Dr. Reena Isaac, a forensic pediatrician at the Children's Assessment Center ("CAC"), conducted Y.M.'s physical examination. She reported that Y.M.'s anal examination was normal, but she did not expect to find any signs of injury; due to the elapsed time between the exam and the alleged abuse, any injury would have healed

"pretty quickly." Dr. Isaac also explained why Y.M. was never asked directly if appellant's penis had touched her anus:

[Prosecutor]: And so did you ask, though, or did a doctor ask if someone had touched [Y.M.]'s anus with a penis?

[Isaac]: That's not typically a question we ask a 6-year-old.

[Prosecutor]: So it's more of a broad understanding.

[Isaac]: Yes. The idea is we don't want to put ideas in a child's head.

Dr. Isaac also testified concerning her individual interview with Y.M., conducted outside of her mother's presence. When Y.M. was asked, "[w]here did he put his parte? [sic]," Y.M. told her, "Nowhere." The State proceeded to ask Dr. Isaac regarding Y.M.'s other responses during the interview:

[Prosecutor]: And, [she was asked] "Did something come out of his parte?"

[Dr. Isaac]: And she responded, "Yes."

[Prosecutor]: It was -- "What did it took like?"

[Dr. Isaac]: Her response was, "It was white."

[Prosecutor]: And again, the question is, "How many times?" And it's, "More than once"?

[Dr. Isaac]: Yes.

## F.     Amanda Rocha's Testimony

Amanda Rocha, a CAC forensic interview clinician, testified that she interviewed Y.M. Rocha explained that when conducting interviews, they always look for signs of coaching, such as seeking approval from family members or the inability to give clarifying or sensory details. Rocha testified that a child being able to describe clarifying

information, such as who/what/where/when questions, and sensory information, which includes things the child might have seen, heard, smelled, tasted, or felt, is important because "[t]ypically a child who is able to give clarifying or sensory information is able to do so because they have gone through or lived [the] experience." Rocha opined that Y.M. was calm and focused when describing the abuse, had a consistent demeanor throughout the interview, and answered questions immediately while also sharing sensory details.

## G.    Daniela Colburn-Prado's Testimony

Daniela Colburn-Prado testified that she was Y.M.'s therapist at CAC from 2018 to 2020. Colburn-Prado testified that when a child is coached on what to say, "There's not going to be any differences. There's not going to be a lot of emotion attached to it. There's not going to be a lot of the five senses involved in that memory. So it's very rehearsed like a script." In her opinion, Y.M. did not exhibit any signs of being coached and Y.M. was able to articulate sensory details in describing the alleged abuses by drawing demonstrative pictures of the home's layout, demonstrating physically how she and appellant were positioned, and giving sensory details such as what the locations looked like and how she felt. In addition, Coburn-Prado observed that Y.M. suffered from intrusive thoughts about sexual abuse.

## H.    Patty's Testimony

Patty admitted that she had been asked to babysit Y.M. four or five times, but she denied that appellant was ever alone with Y.M. or even at home when she babysat Y.M. According to Patty, appellant would leave for work at 6 a.m. and return around 7 p.m. However, Patty acknowledged that appellant admitted to police that he was present to

greet Y.M. when she was dropped off and that appellant "knew a lot about [Y.M.]," despite the fact that he was "never there."

## I.    Testimony of Appellant and His Father

Appellant denied abusing Y.M. Appellant claimed he normally left for work around 6:00 a.m. and returned around 7:00 p.m. Thus, according to appellant, he could not have abused Y.M. because he was never alone with her.

Appellant's father, Jose Lopez, testified that he had been living with appellant for thirteen years. According to Jose, he and his son would leave the home to separately look for work around 6 a.m. Jose generally characterized appellant's treatment of children as "good." He also denied conspiring to lie to cover up his son's alleged abuse.

After the jury returned a guilty verdict, the trial court assessed punishment at fifty-five years' imprisonment. Appellant filed a timely notice of appeal.

## II.    DISCUSSION

In his first issue, appellant first argues that the evidence is legally and factually insufficient to prove beyond a reasonable doubt that he sexually assaulted Y.M. In what we construe as his second issue, appellant asserts that he is entitled to a factual sufficiency review of the evidence in this case, and that the Texas courts of appeal have denied criminal defendants a "meaningful review of the evidence" by misapplying *Jackson v. Virginia* to factual sufficiency reviews. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979).

## A.    Legal Sufficiency of the Evidence

### 1.    Standard of Review & Applicable Law

We apply a legal-sufficiency standard of review in determining whether the evidence supports each element of a criminal offense that the State is required to prove

beyond a reasonable doubt. *Id.*; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see also Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011). Under this standard, we examine all the evidence adduced at trial in the light most favorable to the verdict to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *Temple*, 390 S.W.3d at 360; *Criff v. State*, 438 S.W.3d 134, 136–37 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). We consider all evidence in the record, whether admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013). We also consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We will uphold the jury's verdict unless a rational factfinder must have had reasonable doubt as to any essential element. *West v. State*, 406 S.W.3d 748, 756 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

We do not, however, re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because the jury is the sole judge of the witnesses' credibility and the weight given their testimony, we resolve any evidentiary conflicts or inconsistencies in favor of the verdict. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) ("We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder."); *Isassi v. State*, 330 S.W.3d 633, 643 (Tex. Crim. App. 2010) ("As long as the jury's finding of a culpable intent 'is supported by a reasonable inference, it is within the province of the factfinder to choose which inference is most reasonable.'"); *Bargas v. State*, 252 S.W.3d 876, 887

(Tex. App.—Houston [14th Dist.] 2008, no pet.) ("The jury may choose to believe or disbelieve any portion of the witnesses' testimony.").

But a jury is not free to weigh the evidence and make credibility determinations without limits:

> A jury's decision to reject witness testimony must be rational in light of the totality of the record, and any underlying inferences used to reject that testimony must be reasonable based upon the cumulative force of all of the evidence. Moreover, a jury is not permitted to disregard undisputed objective facts that can support only one logical inference.

*Braughton*, 569 S.W.3d at 608 (internal citations omitted).

Sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge and as authorized in the indictment. *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The hypothetically correct jury charge is one that 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240). "The 'law as authorized by the indictment' includes the statutory elements of the offense and those elements as modified by the indictment." *Id.* (quoting *Daugherty v. State*, 387 S.W.3d 654, 665 (Tex. Crim. App. 2013)). Our use of the hypothetically correct jury charge ensures a judgment of acquittal is reserved for cases in which there is an actual failure in the State's proof of the crime, rather than a mere error in the jury charge. *McCombs v. State*, 562 S.W.3d 748, 759 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (citing *Malik*, 953 S.W.2d at 240).

The hypothetically correct jury charge in this case would state Rancoco committed aggravated sexual assault of a child if Rancoco intentionally or knowingly caused the anus of Y.M. to contact the mouth, anus, or sexual organ of Rancoco. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(iv).

A conviction for aggravated sexual assault of a child is "supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within one year after the date on which the offense is alleged to have occurred." Tex. Code Crim. Pro. Ann. art. 38.07; *see Martinez v. State*, 178 S.W.3d 806, 814 (Tex. Crim. App. 2005).

We also give "wide latitude to testimony provided by child victims of sexual abuse." *Jones v. State*, 428 S.W.3d 163, 169 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990) ("[W]e cannot expect the child victims of violent crimes to testify with the same clarity and ability as is expected of mature and capable adults. To expect such testimonial capabilities of children would be to condone, if not encourage, the searching out of children to be the victims of crimes such as the instant offense in order to evade successful prosecution."). "There is no requirement that the child be able to testify as to penetration. The slightest proof of penetration is sufficient so long as it is proved beyond a reasonable doubt." *Hemphill v. State*, 826 S.W.2d 730, 733 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) (internal citation omitted); *see Jones*, 428 S.W.3d at 169 ("[A]s long as the child communicates to the jury that the touching occurred on a part of the body within the definition of the statute, the evidence will be sufficient.").

**2. Analysis**

Appellant argues that there is only a "modicum of evidence" that he caused his sexual organ to contact Y.M.'s anus. According to appellant, "[a]ll the other evidence in the case either negated the allegation or left a reasonable doubt about its truthfulness." Although Y.M. testified regarding the alleged sexual abuse, appellant focuses on the fact that there is no physical evidence of appellant's alleged assault. For instance, Suarez testified that Y.M.'s medical records reflected that no physical trauma was detected on Y.M.'s body. Additionally, Suarez could not say whether she had been assaulted; he only opined that it was a possibility.

Furthermore, appellant asserts that according to the testimony of Rocha, the CAC forensic interview clinician, Y.M. had difficulty with the sequence of events. Dr. Isaac also testified that Y.M.'s anal exam was normal. Additionally, Dr. Isaac admitted on cross-examination that when Y.M. was asked, out of the presence of her mother, where appellant touched her with his sexual organ, Y.M. responded, "Nowhere." However, we disagree with the assertion that there was insufficient evidence to support his conviction.

A child sexual-abuse victim's uncorroborated testimony is sufficient to support a conviction for aggravated sexual assault. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *Martinez*, 178 S.W.3d at 814. Thus, Y.M.'s description of appellant's sexual organ touching her anus is sufficient by itself to sustain the conviction; the State had no burden to present physical evidence. *See Martinez*, 178 S.W.3d at 814. The State's witnesses collectively testified that it was expected and normal for Y.M.'s physical examinations to show no physical signs of trauma because she was examined outside of the ninety-six-hour window of time after the alleged assault. Additionally, the State's witnesses testified that it is fairly normal for children to be confused on the sequencing of events and that there were no signs of Y.M. having been coached.

As previously noted, we resolve any evidentiary conflicts or inconsistencies in favor of the verdict. *See Braughton*, 569 S.W.3d at 608. Considering all the evidence adduced at trial in the light most favorable to the verdict, we conclude that the jury was rationally justified in finding guilt beyond a reasonable doubt. *See Temple*, 390 S.W.3d at 360. We overrule appellant's first issue.

## B.     Factual Sufficiency Review in Criminal Cases

In his second issue, appellant argues that under the Texas Constitution, he is entitled to a factual sufficiency review of the evidence, and that the Texas courts of appeal have misapplied *Jackson v. Virginia* to deny defendants in criminal cases the right to a factual sufficiency review of the evidence.

## 1.     Applicable Law

The Factual-Conclusivity Clause of the Texas Constitution states: "Provided, that the decision of [appellate] courts shall be conclusive on all questions of fact brought before them on appeal or error." Tex. Const. art. V, § 6. However, current binding precedent from the Court of Criminal Appeals concludes that appellate courts are to employ a legal sufficiency review of the evidence in criminal cases, not a factual sufficiency review. *See Braughton*, 569 S.W.3d at 607; *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Additionally, our sister court has previously declined the invitation to conduct a factual sufficiency review in a criminal case. *See Vernon v. State*, 571 S.W.3d 814, 820 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) ("Vernon requests that this court abandon its precedent and conduct a distinct factual-sufficiency review that would ignore the rule that jurors are the exclusive judge of witness credibility. The Court of Criminal Appeals in *Brooks v. State* directed intermediate courts to apply the *Jackson*

standard of review as the sole standard for both legal and factual sufficiency challenges.").

## 2. Analysis

Appellant asserts that he is entitled to a factual sufficiency review of the evidence, and thus, we should review all the evidence, not just the evidence in favor of the verdict. Appellant cites to a single, concurring opinion from the First Court of Appeals in support of his argument that appellate courts in Texas should conduct a factual sufficiency review in criminal cases. *See Paredes v. State*, No. 01-15-00708-CR, 2017 WL 817170, at *11 (Tex. App.—Houston [1st Dist.] Mar. 2, 2017, pet. ref'd) (mem. op., not designated for publication) (Jennings, J., concurring).

However, within the last few years, this court has rejected this exact argument on multiple occasions. *See Green v. State*, No. 14-20-00228-CR, 2021 WL 3629073, at *7 (Tex. App.—Houston [14th Dist.] Aug. 17, 2021, pet. ref'd) (mem. op., not designated for publication); *Houston v. State*, No. 14-18-00726-CR, 2020 WL 1883421, at *2 (Tex. App.—Houston [14th Dist.] Apr. 16, 2020, pet. ref'd) (mem. op., not designated for publication). In *Green*, we observed that according to the current binding precedent of the Texas Court of Criminal Appeals, criminal defendants are not entitled to a factual sufficiency review of the evidence on appeal:

> Appellant asks that we also review the evidence for factual sufficiency. Appellant acknowledges the Court of Criminal Appeals' opinion in *Brooks v. State*, in which a plurality of the court held that "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." Appellant argues, however, that the Texas Constitution and the Code of Criminal Procedure compels courts to perform a factual sufficiency review when requested.

A plurality opinion, like *Brooks*, is not binding precedent.

Since *Brooks* was decided, however, the Court of Criminal Appeals has rejected calls to reinstate factual sufficiency review. And our court has followed *Brooks* since its issuance.

Accordingly, we reject appellant's request to review the evidence for factual sufficiency, and we overrule his second issue.

*Green*, 2021 WL 3629073, at *7 (internal citations omitted); *see Howard v. State*, 333 S.W.3d 137, 138 n.2 (Tex. Crim. App. 2011) ("[W]e have abolished factual-sufficiency review.").

Likewise, in *Houston*, our court rejected the defendant's request to review the evidence for factual sufficiency:

> To the extent appellant complains that the failure to perform a factual sufficiency review violates notions of due process, due course of law, and equal protection, we are tasked with following the Court of Criminal Appeals . . . . Therefore, we only apply one standard when reviewing a challenge to the sufficiency of the evidence, and that standard is the standard for legal sufficiency.

*Houston*, 2020 WL 1883421, at *2.

We reject appellant's request to employ a factual-sufficiency review and overrule his second issue. *See Howard*, 333 S.W.3d at 138 n.2; *Green*, 2021 WL 3629073, at *7; *Houston*, 2020 WL 1883421, at *2.

## III.  CONCLUSION

The judgment of the trial court is affirmed.

                                    /s/     Margaret "Meg" Poissant
                                            Justice


Panel consists of Justices Spain, Poissant, and Wilson (Spain, J., concurring).

Do Not Publish — Tex. R. App. P. 47.2(b).