**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00150-CR**
_____

**ALTON LAPOINTE JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 252nd District Court
Jefferson County, Texas
Trial Cause No. F23-41405

**MEMORANDUM OPINION**

A grand jury indicted Appellant Alton LaPointe Jr., a/k/a Alton Ray LaPointe, ("Appellant" or "Junior") for the offense of indecency with a child by contact, a second-degree felony. *See* Tex. Penal Code Ann. § 21.11. Appellant pleaded "not guilty," but a jury found him guilty. After a hearing on punishment, the jury assessed

punishment at three years in prison.[1] In a single issue on appeal, Appellant challenges the sufficiency of the evidence to support his conviction. We affirm.

## Evidence at Trial

Alton LaPointe Sr. was called "Senior" at trial, and Alton LaPointe Jr. was called "Junior" at trial.[2] Senior had children with three women: Laura, Amelia, and Venetta. The Appellant, Junior, is Senior's son, and Laura is his adoptive mother. Junior was seventeen years old at the time of the alleged offense. The alleged victim, Montana, is one of Senior's children with Amelia, and Amelia has a total of seven children. Montana was five years old at the time of the alleged offense. Venetta has four children fathered by Senior.

### Venetta's Testimony

Venetta testified that she lived in one side of a duplex with her four children, and Amelia lived in the other side of the same duplex with her seven children, including Montana. Venetta explained that she and Amelia are close friends, and

---

[1] This appeal is from trial cause number 23-41405. At trial, this cause was consolidated with another cause number, 23-41404, which was a charge for sexual assault of a minor. The alleged victim in both trial causes was the same child. The jury found Appellant not guilty of sexual assault of a minor but found him guilty of indecency with a child. This appeal pertains only to Appellant's conviction for indecency with a child.

[2] We use pseudonyms to refer to the mothers and children other than Appellant. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"). The only children discussed by name are Junior and Montana.

2

they help one another with their children. According to Venetta, Senior did not live in the duplex, but he was a "great support for the kids."

Venetta testified that Junior is Senior's older son, she identified Junior as the defendant, and she recalled that it was "normal[]" for Junior to visit her home or Amelia's to visit his half-brothers and -sisters. Venetta further testified that her children and Amelia's children regarded Junior as a big brother, and Junior lived with his adoptive mother, Laura, about three blocks from the duplex. According to Venetta, her oldest child was eight, and Amelia's oldest child was about eight. Venetta recalled that Junior played video games with the younger children and that Junior was good with the younger children "[f]or the most part," but there were "little things" that would bother her, such as his unrestricted use of his phone, which often showed "pornographic pop-ups." She also recalled that sometimes she would have to speak to Junior about where he put his hands when picking up the younger children, talking to strangers online, and going to bed on time.

Venetta recalled that on January 27, 2023, she was watching her children and Amelia's because Amelia had to run to the store at about 7 p.m. She took all of her children over to Amelia's side of the duplex, and Junior was at Amelia's home, too. The children were in the living room watching a movie, and Venetta recalled that Amelia told her that Junior wanted to lie on the couch because he had a headache, which Venetta found "weird." Venetta testified she was in the kitchen when she

heard a noise upstairs. She thought it was Junior going upstairs to the bathroom, although he usually asked to use the bathroom because he did not live there. According to Venetta, Junior was about six feet tall and weighed about 300 pounds, and she knew it was Junior who had gone upstairs "because of the weight."

After a few minutes, Venetta noticed that Junior and Montana were not in the living room, and when she asked the other children where Montana was, they pointed and said, "the stairs." Venetta testified that she "had a little red flag with them not being there," she yelled up the stairs, "Where's [Montana]?" and Junior replied, "I don't know. She's not up here." Venetta testified that she went upstairs and discovered that Junior was "playing like he didn't know[]" where Montana was and pretended to help Venetta look for Montana. According to Venetta, when she got upstairs and went into a bedroom,

> [Montana] was sitting up on the bed with her feet on the bed as well, so her knees were up, and her legs were apart but not spread, just apart. And she had her top on, and her pants were all the way off, except for one ankle, just kind of swooped to the side.
> . . .
> [She] just remember[ed] how wide [Montana's] eyes were, like, she wasn't crying or she was just silent. Her eyes were so big.

Venetta testified that Montana was five years old at the time, and Venetta thought she "wanted to kill" Junior. When Venetta turned around, she hit Junior in the chest and cursed at him, and she grabbed Montana to take her downstairs. Venetta recalled that she was nervous because of Junior's size, but she "realized the gravity of the

4

situation." Venetta testified that when she told Junior to leave, he ran out of the house without any of his things and was "pleading" with her not to call the police.

Venetta agreed that a surveillance system was installed at the house, and some of the events were captured on video. Venetta identified State's Exhibit 8 as a video from her surveillance camera from January 27, 2022, and the video was admitted and published to the jury. Venetta testified that the video depicts her opening the front door and yelling at Junior to get out of the house. Venetta recalled that she yelled something about calling the police, and Junior left the house.

Venetta testified that after Junior left, she had her phone and called Amelia, who did not answer, and then she called Senior, who said he was on his way to her house. According to Venetta, Senior and Laura (Junior's adoptive mother) showed up at her house about five or ten minutes later, and Amelia showed up about ten minutes after Senior. Venetta recalled that Laura seemed "truly concerned" and asked Montana questions. Venetta testified that Amelia went to Montana, and "she just kind of observed [Montana] down there, and [Amelia] said that [Montana] did look red." Venetta did not call the police at the time, but she testified that she "should have[]" and Montana was "a little distraught[]" that night. Venetta recalled that the police came out two days later, and she gave them a statement and told them about the surveillance video.

On cross-examination, Venetta testified that, at the time of the incident, Montana was five years old. Venetta testified that at some point, Junior had trouble in school, and he had some disabilities and behavioral problems, including ADHD. Venetta thought Junior had trouble in school because his mother "kept moving him around[.]" According to Venetta, in the summer of 2021, Junior stopped visiting as often, but she did not find it unusual because of the age gap between Junior and the other children. Venetta testified that she regarded Junior as addicted to video games.

Venetta testified that she thought it was strange that Junior went upstairs the day of the incident without asking, and that his footsteps "sounded like it was three hops." She recalled that it was "a huge red flag" for her when Junior said Montana was not upstairs because she knew Montana was not downstairs, and she testified that Junior "pretended to look" for Montana while Venetta came upstairs. When Venetta got upstairs, she went into Amelia's room, she saw Montana, she started screaming, "I'm calling the police[,]" and Junior pleaded with her not to call the police.

Montana's Testimony

Montana testified at trial. She stated she was seven years old, and she lives with her mother, brothers, and father. She testified that she was in court because of "what happened, what [Junior] did to [her]." Montana did not see her brother Junior in the courtroom. She testified she recalled Venetta being upstairs and loudly telling

6

Junior to get out. According to Montana, Junior did not take off her clothes. She also testified that her mother was angry about Junior "coming up there." Montana further testified that Junior does not come to her house and also "[h]e staying there all day[,]" and that Junior did not touch her anywhere. When shown a drawing of a girl's body, Montana identified the "private part[]" and the "butt." The following exchange occurred:

[Prosecutor]: . . . Now, did [Junior] ever touch you?

[Montana]: I know he touched me.

[Prosecutor]: Where did he touch you?

[Montana]: Right here (indicating).
. . .
[Prosecutor]: Did he touch you on your leg or on your private parts?

[Montana]: On my leg.

[Prosecutor]: He didn't touch your private parts?

[Montana]: He don't. He doesn't - - he not touch my private part.

Montana also testified that no one touched her or took off her clothes except for her mother, when she would take a bath. She agreed she told her mother that Junior touched her:

[Prosecutor]: So did you tell your mommy - - are you saying [Junior] did touch you or did not touch you?

[Montana]: He did.

7

[Prosecutor]: He did touch you. Okay. Did he touch you with your clothes on, or did he touch when you were looking like this [], with no clothes on?

[Montana]: I would have my clothes on.

[Prosecutor]: You had your clothes on?

[Montana]: Yeah, with [Venetta].

[Prosecutor]: All right. And did that hurt you, [Montana]?

[Montana]: No.

[Prosecutor]: He didn't hurt you?

[Montana]: It did hurt.

[Prosecutor]: It hurt a little bit?

[Montana]: Yes.

[Prosecutor]: Okay. And did you tell your momma that?

[Montana]: Yes.

[Prosecutor]: Okay. And did you - - were you scared when that happened?

[Montana]: Yes.

[Prosecutor]: You were?

[Montana]: Yeah.

[Prosecutor]: Okay. Were you scared of [Junior]?

[Montana]: Yes.

[Prosecutor]: Okay. Why? Why were you scared of [Junior]?

> [Montana]: Because he's a monster because my brother - - mom's dad cousin - - my dad told him to get out.

Montana also testified that she was happy when Venetta came to get her out of there and covered her up, and that Montana "was safe because [Venetta] saved [her] life." When the prosecutor asked Montana again whether Junior touched her on the outside or inside, Montana replied, "[r]ight there" and indicated, and she also stated, "[h]e not touch nothing because he's my brother." Montana recalled going to the hospital when she was sick and going to the school nurse.

Amelia's Testimony

Amelia testified that she has seven children, Montana is one of her children, Montana was five years old in January of 2022, and Senior is Montana's father. Amelia explained that she and Venetta live in the same building and they "coparent" and look after one another's children. According to Amelia, Junior was "part of the family[,]" and when he visited her home, he had chores and rules.

Amelia recalled that on January 27, 2022, she went to the grocery store, and her children were at her home with Venetta. While she was shopping, she got a phone call from Senior. Amelia testified that she dropped what she was doing and "sped home." When she got home, her daughter Montana was in the living room with Venetta, Senior, and Laura (Junior's adoptive mother). Amelia thought Montana looked frightened and scared. According to Amelia, when Montana told her, Amelia called the police and made a report a few days later. Amelia took Montana upstairs

9

to "check[] her out," and Laura followed her upstairs. When Amelia recognized what happened, she was shocked. According to Amelia, Montana was shy and scared to speak, so she did a "little dance" to show Amelia why she was uncomfortable.

Amelia testified that when the police came to the house, the Officer did not talk with Montana, and she was instructed to take Montana to the hospital for an exam. Amelia recalled that Montana was scared, and Montana's behavior has changed such that she is "not herself sometimes[]" and "daze[s] off looking into her little world," which Montana did not use to do. According to Amelia, Montana has a speech impediment. Amelia also testified that she took Montana to Garth House for a forensic interview, and Montana also talked to a CPS caseworker. Amelia explained that the situation "was mind blowing and not something that [she] expected at all[,]" and she had not seen Junior since the incident.

On cross-examination, Amelia testified that Junior had problems at school, he made unwise decisions, he was on medications—including sleeping pills and ADHD medication—and he went to counseling. Amelia was concerned that Junior played video games a lot, that his gaming was out of control, and that others were concerned about this, too. Amelia recalled that she had taken Junior's phone away from him multiple times. According to Amelia, on January 27, 2022, Junior's mother had grounded him from playing video games, and he was supposed to have been home doing chores.

Testimony of Kaylee Sliger

Kaylee Sliger testified that she is a nurse qualified as a forensic nurse or Sexual Assault Nurse Examiner ("SANE," which also refers to a Sexual Assault Nurse Exam), and she works in the emergency room at Christus-St. Elizabeth Hospital. She agreed she performed a SANE on Montana on January 29, 2022, and she examined Montana from head to toe, including her genital area, but she did not do a speculum exam on Montana because she was only five years old. Sliger identified State's Exhibit 9 as her report, which was admitted into evidence.

Sliger testified that she reported that Montana was "[c]alm, cooperative, playful, speech was difficult to interpret related to age and lisp. Patient soft-spoken, whispers often." Sliger further testified that she reported on what Montana told her:

> Patient states Momma got me on the way here. Momma love me. [Junior], Deedee, brother, he put hand right here -- in parenthesis I said "points to vagina" because the child gestured to that area.
> She said, yeah. In parenthesis I said, "forensic nurse asked if patient has clothes on." Yeah. Forensic nurse asked if this has happened more than one time.
> . . .
> He put his hand right here. . . .
> . . .
> He put his lips right here, points to vagina. Patient shakes head yes when asked if it hurt. He put his hand in - - points - - she gestured to her vagina again. He is dumb. What's your name. Morning. He opened the door, got in my house and he said get out. [Venetta] seen me and she said, Go, [Junior]. After he took off my shirt and pants, I think he wanted to kill me. He kissed my mouth. His hand - - we also - - this says, forensic nurse asked if [Junior] made her touch him anywhere.
> . . .

11

> . . . she had said he made her touch his hand.
>
> . . .
>
> . . . He put his lips right here and gestured to her genitals. . . . He put his hand right here, and she gestured to her genitals, as well.
>
> . . .
>
> . . . He put his hand in, and she pointed to her vagina.
>
> . . .
>
> . . . He kissed my mouth. . . . He put his lips right here, and she pointed to her vagina. And he put his hand in and pointed to her vagina.

The prosecutor asked Sliger if Montana gave her information that she was touched or sexually assaulted, and Sliger replied, "Yes." Sliger further testified that Montana had some redness in her genital region and some itching, which Sliger regarded as normal. According to Sliger, it is "very uncommon" to see injury in alleged sexual assault victims. Sliger wrote in her report that "[p]atient gives history of acute sexual assault. [] No bodily injury, no anogenital injury, forensic evidence collected." When the prosecutor asked Sliger what her impression was from examining Montana, Sliger replied, "[t]hat she was sexually assaulted." According to Sliger, when Montana said "he put his hands in[,]" to Sliger that meant "he caused penetration." She also testified that Montana "gave history of penetration[]" and "a history of sexual assault."

On cross-examination, Sliger agreed that it sounded like Junior had oral sex with Montana, and that Montana also reported that Junior had taken off his shirt and pants. Sliger also agreed that she understood Montana to say that Junior penetrated her with his hand or finger.

12

<u>Testimony of Officer Willy Melonson</u>

Officer Willy Melonson, with the Beaumont Police Department, testified that he was on patrol on January 29, 2022, from about 4 p.m. until 2:30 a.m. He recalled that he was called to a residence where two mothers live next door to one another and take care of each other's children, and the report concerned "a teenager [who] had possibly sexually assaulted a smaller child." According to Melonson, he spoke with Venetta and Amelia, and they both gave written statements, and he instructed Montana's mother, Amelia, to take her to Christus-St. Elizabeth Hospital for a SANE exam. Officer Melonson identified State's Exhibit 10 as a video from his body camera from that night, and the exhibit was admitted into evidence and published to the jury. The video depicts Officer Melonson talking with Venetta and Amelia. Venetta told the Officer that when she went upstairs that night, Montana's pants were off, and Montana said "thank you" to Venetta. The video shows Amelia telling the Officer that, when she checked Montana, "it looked like it's been pushed in [and] it wasn't like it was before."

<u>Testimony of Magan Bonner</u>

Magan Bonner testified that she is a forensic interviewer at Garth House, and she conducted a forensic interview with Montana on February 11, 2022. Bonner recalled that, although she could communicate with Montana, it was hard to

13

understand some things Montana said, and Bonner testified that other five-year-olds that she had seen had better communication skills.

Testimony of Daniel Norsworthy

Daniel Norsworthy testified that he currently works on patrol, he worked as a detective for the Beaumont Police Department for over ten years, and he was assigned to investigations in January of 2022. He recalled that he was assigned to this case, which he stated involved "an outcry from a young female about a potential sexual assault." According to Norsworthy, his investigation led him to identify Alton LaPointe Jr.—a seventeen-year-old—as the suspect, but he was not able to talk to him or see him in person. Norsworthy explained that his job includes making sure that evidence from a SANE gets to the DPS lab, although not all cases produce biological or DNA evidence.

Testimony of Julie Prudhome

Julie Prudhome testified that she is the clinical director of Garth House, a licensed professional counselor, and the supervisor for counselors at Garth House, where she has worked for twenty-six years. Prudhome agreed that she did not treat nor counsel Montana in this case.

Prudhome testified that younger children may sometimes be confused in counseling and typically do not provide as many details as older children, who are more able to give a cohesive story. According to Prudhome, some children have

difficulty finding the words to say what happened to them because they do not understand sexual behavior, and some children may avoid talking due to trauma. Prudhome testified that "most child abuse victims do know their perpetrator[]" and the child may be reluctant to talk due to their relationship or a fear of upsetting or harming the person. Prudhome agreed that sometimes a child might report that something happened, and then quickly thereafter say it did not happen, and such a change does not mean the event did not occur. She also testified that sometimes a child victim may tell a SANE more about what happened than the child has told others.

Bob's Testimony

Bob, Junior's nineteen-year-old cousin who lives in Silsbee, testified for the defense. According to Bob, he and Junior sometimes connect online while they played video games on Playstation, for as long as twenty-four or twenty-seven hours at a time, and Bob agreed that he and Junior were playing video games on January 27, 2022. Bob testified that because Junior used earbuds and a microphone, Bob could hear Venetta's voice in the background while they played games that day. Bob recalled that on that day Junior had to leave the game for a while because he had a stomachache and went to the bathroom. Bob testified that Junior left his microphone on, and Bob could hear a "commotion going on[,]" and he heard Venetta tell Junior to "get out." Bob contacted his mother, who went to pick up Junior.

15

On cross-examination, Bob testified that he did not recall what video game he and Junior were playing that night, and he agreed he was not with Junior that night and only had contact online through a multiplayer game. Bob agreed that he could hear Venetta and Junior and what they said, even though Junior was using a poor-quality audio headset. Bob also testified that he does not regard Venetta as "family[.]" According to Bob, after he heard the scuffle that night, he did not call the police because he did not know the address.

Laura's Testimony

Laura testified that she lives not too far from where Amelia and Venetta live and that she adopted Junior when he was six months old. According to Laura, Junior had some disabilities when he was growing up, and he was diagnosed with "ADHD [and] bipolar[,]" for which he took medication. Laura testified that Junior was held back in school due to his disability. She also testified that Junior plays video games "all day, day and night[,]" she had to take away the games from him "to do hygiene, to do chores[,]" and on the day of the incident, she had grounded Junior from using the video games because he did not do his chores.

Laura recalled getting a phone call from Junior on January 27, 2022, and Junior told her he was accused of doing something he did not do. Laura testified that she also received a phone call from Senior, and as a result, she and Senior went to the duplex where Venetta and the children were, and they had a conversation about

16

possible sexual assault by Junior of one of the children. According to Laura, she saw Montana that night, and Montana did not seem upset or distraught. Laura recalled that Senior asked her to "check [Montana] out[,]" and Laura went upstairs, she looked at Montana's private parts, and she did not see anything "alarming." After talking to Senior, Laura and Amelia took Montana back upstairs and examined Montana with her mother (Amelia) there. According to Laura, she did not have any concerns after she checked Montana a second time, and the police were not called. Laura recalled that Bob's mother came to pick up Junior that night.

On cross-examination, Laura testified that she went to the duplex that night, but Junior had already left. Laura testified that she talked to and examined Montana that night, even though Montana's mother was not yet at home, because Senior asked her to. Laura agreed she was not qualified to conduct a sexual assault examination of a child.

Junior's Testimony

Junior testified that he was nineteen years old at the time of trial, and that he had completed the tenth grade. According to Junior, he had problems in school, but he had never been in trouble. Junior recalled that he used to play video games a lot, even for twenty-four hours at a time, and when he played, he used a headphone to communicate with people online. Junior agreed that he used to play games with his cousin, Bob, he was playing with Bob on the day of the incident, and he had sneaked

17

out to Amelia's house that day to play because he was grounded from playing video games at his own home because he did not do his chores.

According to Junior, Amelia "used to be a mother to [him] but not anymore[,]" and Amelia had children with his father, Senior. Junior testified that Venetta had children with Senior, and Junior also used to go to her house sometimes. Junior recalled that, on the day of the incident, there were eight other children at Amelia's house, and he was not feeling well that day, so he asked Amelia to get him a soft drink when she went to the store. According to Junior, at some point, he left the video game to go to the restroom, but he did not turn the game off. Junior recalled that, when he left the restroom, he heard Venetta say, "Where is [Montana]?", but he did not know where Montana was at that time. Junior testified that Venetta yelled at him, accused him of something, and asked if he molested or touched Montana. Junior said he did not, but Venetta started hitting him and told him to leave. Junior testified that Bob's mother picked him up and took him to her house. According to Junior, he did not commit aggravated sexual assault by putting his fingers in Montana's private parts, and he did not commit indecency with a child by touching Montana, and he testified that he did not even see Montana that day, although he knew she was in the house.

On cross-examination, Junior agreed that he usually asked to go upstairs to use the restroom at Amelia's house, but he did not ask on the day of the incident.

Junior agreed he told Venetta that he did not know where Montana was. Junior testified that he left Amelia's house that night without his shoes because Venetta was "screaming and yelling[]" at him, and when he got to his house, he waited for Bob's mother to pick him up so he could get away from his father, who had "said some things that made [Junior] not want to be there." According to Junior, he told his father many times to take Montana to the emergency room to be checked, but his father did not do so.

After the close of evidence, the jury found Junior guilty of indecency with a child as charged in the indictment. After a hearing on punishment, the jury assessed punishment at three years of imprisonment. Junior timely filed a notice of appeal.

Issue

Appellant argues that the evidence was not sufficient to support his conviction. According to Appellant, the testimony of Montana, the alleged victim "basically exonerated" him because she testified that Junior did not take off her clothes and he did not touch her anywhere, even though she also testified that Junior touched her leg. Appellant also argues that Montana's answers to questions were "unrelated and nonsensical[,]" and that she "clearly and repeatedly denied" the facts alleged in the indictment. Appellant also argues that the SANE's testimony was merely "her interpretation of what the child meant," and the only inculpatory evidence was based on the investigators' conjecture, speculation, and unfounded

19

opinions. According to Appellant, Montana gave contradictory testimony, and it is not reasonable for the jury to believe Montana's testimony that acquitted him on the charge of sexual assault but then disbelieve her testimony that would have acquitted him on the charge of indecency, citing to *Martinez v. State*, No. 10-04-00072-CR, 2005 Tex. App. LEXIS 2849 (Tex. App.—Waco Apr. 13, 2005, pet. ref'd) (mem. op., not designated for publication) (reversing Martinez's conviction for indecency because the only evidence tending to support the verdict was directly contradicted by the victim herself). Appellant contends that no rational juror could have found the elements of the crime charged beyond a reasonable doubt.

Standard of Review

In reviewing the legal sufficiency of the evidence to determine whether the State proved the elements of the offense beyond a reasonable doubt, we apply the *Jackson v. Virginia* standard. *Brooks v. State*, 323 S.W.3d 893, 894-95, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under that standard, a reviewing court must consider all the evidence in the light most favorable to the verdict and determine whether a rational justification exists for the jury's finding of guilt beyond a reasonable doubt. *Id.* at 902; *see also Jackson*, 443 U.S. at 319. "A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony." *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018). As the trier of fact, the jury is the sole judge of the weight and credibility

20

of the witnesses' testimony, and on appeal we must give deference to the jury's determinations. *Brooks*, 323 S.W.3d at 899, 905-06. If the record contains conflicting inferences, we must presume the jury resolved such facts in favor of the verdict and defer to that resolution. *Id.* at 899 n.13 (citing *Jackson*, 443 U.S. at 319). On appeal, we serve only to ensure the jury reached a rational verdict, and we may not substitute our judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). In our review, we consider both direct and circumstantial evidence and all reasonable inferences that may be drawn from the evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

To establish the offense of indecency with a child by contact, the State had to prove that Appellant engaged in sexual contact with Montana, a child younger than seventeen years of age. *See* Tex. Penal Code Ann. § 21.11(a)(1). Section 21.11's definition of "sexual contact" includes the act, if committed with the intent to arouse or gratify the sexual desire of any person, of "any touching by a person, including touching through clothing, of . . . any part of the genitals of a child[.]" *Id.* § 21.11(c)(1). The testimony of either a child victim or an outcry witness is sufficient to support a conviction for indecency. *Humphries v. State*, No. 09-17-00104-CR, 2019 Tex. App. LEXIS 1033, at *23 (Tex. App.—Beaumont Feb. 13, 2019, no pet.) (mem. op., not designated for publication) (citing *Jones v. State*, 428 S.W.3d 163,

21

169-70 (Tex. App.—Houston [1st Dist.] 2014, no pet.)); *Gonzalez v. State*, 522 S.W.3d 48, 57 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (citing *Jones*, 428 S.W.3d at 169-70); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd); *see also* Tex. Code Crim. Proc. Ann. art. 38.07. The State has no burden to produce any corroborating or physical evidence. *See Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006) (concluding that medical or physical evidence is not required to corroborate child victim's testimony). A person's intent to arouse or gratify sexual desire can be inferred from the person's conduct and the surrounding circumstances. *See McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981); *see also Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009) (explaining that all the evidence—both direct and circumstantial—admitted at trial to support the conviction should be reviewed equally on appeal).

Courts give wide latitude to testimony provided by child victims of sexual abuse. *See Humphries*, 2019 Tex. App. LEXIS 1033, at *23; *Jones*, 428 S.W.3d at 169; *Gonzalez Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi-Edinburg 2008, no pet.). We liberally construe such testimony. *See Humphries*, 2019 Tex. App. LEXIS 1033, at *23; *Lee*, 176 S.W.3d at 457; *see also Gonzalez Soto*, 267 S.W.3d at 332 ("The victim's description of what happened to her need not be

precise, and she is not expected to express herself at the same level of sophistication as an adult."). The requisite intent for the offense of indecency with a child can be inferred from the defendant's conduct and remarks and all the surrounding circumstances. *See Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991), *overruled on other grounds by Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992) ("[M]ental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs."); *Humphries*, 2019 Tex. App. LEXIS 1033, at \*24; *Gonzalez Soto*, 267 S.W.3d at 332; *Navarro v. State*, 241 S.W.3d 77, 79 (Tex. App.—Houston [1st Dist.] 2007 pet. ref'd).

Analysis

The jury heard seven-year-old Montana's testimony at trial, which we agree was contradictory. The jury heard Montana testify that Junior touched her, that it hurt, and that she was scared. The jury also heard Montana testify that Junior touched her leg and not her private parts, and that she was happy when Venetta got her and covered her up because Venetta "saved her life." Venetta testified that Junior usually asked before using the restroom, but he did not ask on the night of the incident. Venetta also testified that she found Montana that night sitting on the bed, with her knees up and her legs apart, and with her pants pulled down. Montana's mother Amelia testified that Montana looked scared on the night when the incident occurred.

23

Amelia further testified that Montana's behavior has changed since the incident and sometimes Montana is "not herself[.]" Officer Melonson's body camera video shows Venetta telling the Officer that, when she checked Montana after the alleged incident, "it looked like it's been pushed in [and] it wasn't like it was before." The SANE testified that Montana told her that Junior put his hands on her, and Montana pointed to her vagina, and Montana also told the SANE that Junior put his lips on her, and Montana again pointed to her genitals. Junior testified that, after Venetta told him to leave the house, he asked his cousin's mother to pick him up to take him to their home in Silsbee.

As for the inconsistencies between Montana's testimony and her outcry, we presume the jury resolved any conflicting evidence or inferences in favor of the verdict. *See Brooks*, 323 S.W.3d at 899 n.13 (citing *Jackson*, 443 U.S. at 319). The jury was the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given their testimony. The jury was free to disbelieve Appellant's testimony. *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) ("The jury, being the judges of the facts and credibility of the witnesses, could choose to believe or not believe the witnesses, or any portion of their testimony.").

On this record, we cannot say that the State failed to present evidence that Appellant, with the intent to arouse or gratify his sexual desire, touched a part of Montana's genitals. *See Humphries*, 2019 Tex. App. LEXIS 1033, at **24-25.

24

Venetta's and Amelia's testimony was consistent with their reports to the police on the night of the incident, and their testimony was consistent with the SANE's testimony. The jury could have regarded Appellant's flight from the scene and out of town as reflecting consciousness of guilt. *See Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994) (explaining that evidence of flight shows a consciousness of guilt of the crime for which the defendant is on trial), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

Appellant argues that his conviction "rests entirely upon inconclusive evidence, interpretations of what the child may have meant in prior contradictory statements, and subsequent speculation rather than proof beyond a reasonable doubt[,]" and cites to *Alas v. State*, Nos. 02-18-00444-CR & 02-18-00445-CR, 2020 Tex. App. LEXIS 4720, at *7 (Tex. App.—Fort Worth June 25, 2020, no pet.) (mem. op., not designated for publication). We find *Alas* distinguishable on the facts because in *Alas*, the alleged victim made no outcry during her forensic interview, and instead she told the nurse examiner that the defendant did not touch her private parts, and she did not testify at trial. *See id.* at *8.

Appellant also argues that Montana gave conflicting statements and testimony, and that it is not reasonable for the jury to believe Montana and acquit Appellant of sexual assault but to disbelieve her testimony that would have acquitted him of the indecency charge, citing to *Martinez v. State*, No. 10-04-00072-CR, 2005

25

Tex. App. LEXIS 2849, at *7 (Tex. App.—Waco Apr. 13, 2005, pet. ref'd) (mem. op., not designated for publication). In *Martinez*, the alleged victim gave a "vague" statement to a forensic interviewer about where the defendant had touched her. *See id.* at *8. And at trial, the alleged victim testified that the defendant only touched her breasts and had not touched her genital area. *See id.* In *Martinez*, the victim was fifteen years old at the time of the offense but in this case, Montana was five years old at the time of the offense and seven years old at the time she testified at trial. In this case, there was other evidence to support the charge of indecency: testimony by Venetta that she found Montana upstairs when Appellant was also upstairs, and that Montana's pants were pulled down; Amelia's testimony that she checked Montana's private parts, which looked "pushed in"; and Montana's statements to the SANE that Appellant touched her together with Montana pointing to her genital area. We reject Appellant's argument that no reasonable jury could have disbelieved the charge of sexual assault but believed the testimony and evidence on the charge of indecency.

Viewing the evidence in a light most favorable to the verdict and deferring to the jury's responsibility to determine the weight and credibility of the evidence and to resolve conflicts in the evidence, we affirm the trial court's judgment of conviction. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899 & n.13; *Sharp*, 707 S.W.2d at 614; *see also* Tex. Penal Code Ann. § 21.11. We overrule Appellant's issue.

AFFIRMED.

LEANNE JOHNSON<br>Justice

Submitted on March 4, 2025
Opinion Delivered March 19, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.

27