Opinion filed January 15, 2026



# In The

# Eleventh Court of Appeals

_____

## No. 11-24-00189-CR

_____

**KC CHILDRESS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 70th District Court**

**Ector County, Texas**

**Trial Court Cause No. A-21-1267-CR**

### M E M O R A N D U M   O P I N I O N

Appellant, KC Childress, was charged with four counts of aggravated sexual assault of a child, each a first-degree felony offense.  *See* TEX. PENAL CODE ANN. §§ 22.021(a)(1)(B), (a)(2)(B), (e), (f)(1) (West Supp. 2024).   The jury found Appellant guilty on all counts.   For punishment purposes, the State alleged that Appellant had previously been finally convicted of a sexual offense against a child. The jury found that enhancement allegation to be "true" and assessed his punishment

for each offense at life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. *See* PENAL § 12.42(c)(2) (West Supp. 2025). The trial court sentenced Appellant accordingly and ordered that his sentences be served consecutively.

In a single issue, Appellant contends that the evidence is insufficient to support two of his four convictions: (1) the super aggravated sexual assault of Z.M. (Count Three); and (2) the aggravated sexual assault of K.M. (Count Four).[1] We affirm.

## I. *Factual Background*

K.M.'s and Z.M.'s mother (Mother) had four children (B.F., T.M., K.M., and Z.M.) prior to her relationship with Appellant, which began sometime in 2020.[2] Appellant is a registered sex offender, and Mother was aware of this while they were dating. At some point, Mother and her four children began cohabiting with Appellant after she became pregnant with Appellant's child, N.C. Appellant had unsupervised access to the children at various times during his relationship with Mother. Sometime in July 2021, a family friend of Mother, Kristina Bishop, became aware that one of Mother's children, B.F., had been sexually abused by Appellant. Bishop reported this incident to law enforcement who, in turn, initiated an investigation. During the investigation, B.F. made an outcry, and Appellant was subsequently arrested for aggravated sexual assault of a child. At the time of trial, B.F. was around sixteen, K.M. was ten, and Z.M. was around six.

---

[1]To protect the identities of the child victims and the other minor children, we refer to them by pseudonyms or initials. *See* TEX. CONST. art. I, § 30(a)(1); TEX. R. APP. P. 9.10(a)(3).

[2]Before Appellant's trial, Mother had been indicted for (1) aggravated sexual assault of a child; and (2) child endangerment, a second-degree felony offense. *See* PENAL §§ 22.021, 22.041. Mother pled guilty to the child endangerment offense in exchange for testifying against Appellant at trial. Pursuant to a negotiated plea agreement, Mother was sentenced to fifteen years' imprisonment for the child endangerment offense, and the aggravated sexual assault charge was dismissed. Additionally, Mother's parental rights to the children were terminated and her aunt and uncle adopted the children.

Georgina Polanco, a forensic interviewer at the Harmony Home Children's Advocacy Center in Odessa (Harmony Home), testified that she began forensic interviews with K.M. and Z.M. on July 9, 2021. According to Polanco, it was standard protocol to interview children who were between the ages of three and eighteen, depending on the child's developmental level and ability to communicate with the interviewer. Polanco testified that she briefly interviewed K.M. that day. She recalled that K.M. was "barely able to tell [Polanco] her name" and could not "identify body parts[,] answer in complete sentences, [or] answer in real words." Because of this, Polanco believed that K.M. was "nonverbal" and unable to converse with Polanco for the purposes of the forensic interview.

Polanco recalled that Z.M. was three at the time of her forensic interview and that she could converse "slightly" better than K.M. [3] Polanco testified that Z.M. was able to use visual and anatomical drawing aids to identify all of the body parts of a female child's body, including the genitalia; however, Z.M. used the term "leg" to refer to the vagina as depicted in the anatomical drawing. During the interview, Polanco asked Z.M. if "anybody ha[d] ever touched [Z.M.'s vagina]." Z.M. responded that "Tetta" had. Polanco then inquired about the identity of "Tetta" and Z.M. informed her that "Tetta" was a boy who lived in her house. Upon further questioning, Z.M. identified other members of her family who lived with her, such as her brother (T.M.) and her sister (B.F.). Polanco believed that "Tetta" and T.M. were "two different people" based on Z.M.'s statements. Polanco recalled that Z.M. appeared "to be done" with the interview and asked to leave the room after answering these questions, so Polanco terminated the interview.

---

[3]The State provided notice to Appellant of their intent to use Polanco as Z.M.'s outcry witness, and the trial court held a hearing on the State's outcry notice prior to trial. *See* TEX. CODE CRIM. PROC. ANN. art. 38.072 (West Supp. 2025). At the hearing, the trial court determined that Polanco's statement was "reliable based on the time, content, [and] circumstances of the statement."

Jessica Aguilar, a sexual assault nurse examiner (SANE), performed a SANE examination of Z.M. and K.M. in July 2021. Aguilar testified that K.M. was nonverbal and had the mental capacity of a one or two-year-old child. She recalled that K.M. appeared happy and playful during the exam until she performed a "head-to-toe" examination, upon which Aguilar noticed that K.M.'s demeanor changed. Aguilar noted that during the "head-to-toe" examination, K.M. "allowed [Aguilar] to pull her little pants down," but then "sank" her head, and "didn't want anything to do with [Aguilar] after that." Aguilar testified that she terminated the examination shortly after K.M.'s mood changed, thus she was unable to perform an anogenital exam for K.M.

Aguilar also testified that she performed an anogenital exam for Z.M., but she was unable to obtain an oral medical history from Z.M. during her SANE examination. During Z.M.'s anogenital exam, Aguilar noted that Z.M. had two linear scars in her vaginal area—which indicated physical trauma in that area—and that Z.M.'s injuries were like the vaginal scars she had observed on B.F. Additionally, Aguilar noted that the scars she observed on both B.F. and Z.M. were "deeper than a regular laceration from consensual sex." Aguilar opined that these types of linear scars could be related to damage from multiple acts, including "penetration," "touching," or "scratching."

Dr. Mohannad Anbarsvrri, a hospitalist at Medical Center Hospital in Odessa, testified about the contents of K.M.'s medical records and a follow-up visit he performed on K.M. Dr. Anbarsvrri opined that there are differing severities of intellectual disabilities for individuals, like K.M., who have Down syndrome. He testified that, although uncommon, some younger children with Down syndrome may be nonverbal. Dr. Anbarsvrri testified that K.M. was examined by physicians on two occasions. During K.M.'s first consultation with another attending physician, it was noted that K.M. had trauma-based bruises beyond her external

genitalia. Dr. Anbarsvrri stated that this type of trauma could result from a sexual assault, through penetration, and would be "markedly difficult" to result from other acts, such as falling.

Dr. Anbarsvrri noted that K.M. was "uncooperative, and kicking, and screaming" during her examination with the first physician, and that she behaved in a similar manner during his follow-up examination a week later. Dr. Anbarsvrri stated that K.M. "pushed [him] away" when he attempted to examine her abdomen. He said that it is common for patients to be "uncooperative" or to "fight[] back" in circumstances that involve abuse or trauma, and that a child could behave this way because they believe the physician is an assailant. Additionally, Dr. Anbarsvrri recalled that a guardian for K.M. told him that she had been "act[ing] out," "behav[ing] violently with her siblings[,] and hit[ting] them." Dr. Anbarsvrri testified that, based on his experience in treating Down syndrome patients, he believed that K.M.'s behavior could have been caused from experiencing sexual trauma.

Stephanie Schoen, the mental health director at Harmony Home and a licensed clinical professional counselor, testified to recidivism and the behaviors of both victims of sexual abuse and the perpetrators of sexual abuse. Schoen described the extent of her experience treating perpetrators and victims of sexual violence, including child victims of sexual assault. Schoen testified that it is common for a child victim of sexual abuse to not make an outcry or talk to others about the sexual abuse, given that only one-in-four sexual offenses are reported, and that sexual offenses are commonly reported to law enforcement by "friends or siblings" who were told by the child victim about the sexual abuse.

Schoen testified that, unlike a teenager or an adult, younger children may not be able to verbalize or disclose that they are a victim of sexual abuse. According to Schoen, the disclosure of sexual abuse by a child victim is a process that occurs over

5

a period of time based on (1) the child victim's ability to verbalize the sexual abuse they endured, and (2) the preparation and treatment required to allow the child victim to create a "trauma narrative" of the sexual abuse. Schoen stated that it is common for child victims to not remember details of sexual abuse during their first meeting with a forensic interviewer. Additionally, a child victim may be unable to recall detailed information of a sexual assault because of shame or fear. As such, a child victim may not remember all the details of a sexual assault until later when they feel "comfortable and safe."

Schoen testified that child victims can manifest sexual trauma though their behavior, such as "acting out." In other cases, children may engage in "self-harm" after experiencing sexual abuse through depression, nightmares, "bedwetting," or by "shut[ting] down" when discussing their trauma with others. Schoen opined that children under the age of seven (and children who are "mentally very young children") do not have any knowledge of adult sexual behavior. According to Schoen, it is not normal for a young child to "act out" sexual behaviors, like using dolls to show that "adults have sex," and that a child who shows this type of behavior either learned or was taught about sex from an adult.

Schoen explained that sexual offenders who victimize children of all ages ("non-discriminate" offenders), are more common than sexual offenders who victimize children within a discrete age range, such as individuals diagnosed with "pedophilia" or "hebephilia." Schoen testified that sexual predators often use "grooming" behaviors on the children they sexually abuse. Grooming occurs when an adult fosters a relationship with a child though manipulation to (1) gain the child's trust, (2) get the child "comfortable" with the perpetrator by pushing their personal boundaries, and (3) gain access to the child. Schoen testified that it is common for a sexual abuser to "groom" a child through their role as a babysitter, stepparent, or co-parent because these types of roles typically require children to obey the

6

perpetrator. Schoen also stated that perpetrators may groom a child through (1) negative coercions (i.e., threats of harm or punishment for a child's failure to obey the perpetrator in their role as a co-parent), or (2) positive coercions (i.e., gifts or "love bombing" a child with words of affirmation).

Lee Roy Smith, K.M. and Z.M.'s great uncle, testified about his observations of the children's behavior. Smith acquired custody of the children in July 2021, and Z.M. and K.M. have continued to live with Smith and his wife since that time. Smith stated that he has known K.M. and Z.M. since birth and recalled that, growing up, K.M., and all the children "were made to call [Appellant] dad," while Z.M. would not refer to Appellant by any name. However, Smith noticed that all the children stopped referring to Appellant as "dad" after he was arrested; instead, the children referred to Appellant as "dork head" or avoided mentioning Appellant's name during discussions altogether. Smith stated that if someone mentioned Appellant's name in conversation, Z.M. would become "very angry" and "go into like a fit." According to Smith, Z.M. experiences "nightmares" every night and occasionally "wet[s]" the bed. Smith also stated that while Z.M. does not talk about what causes her nightmares, Z.M. had mentioned an instance where she was "locked into a closet."

Smith testified that K.M. was nonverbal when she first began living with him and his wife. Smith noted that, because of this, K.M. would often point at things to communicate her needs, such as pointing her finger towards her mouth if she was hungry. Smith also noted that, even though K.M. has become more verbal since living with him, she has continued to use gestures and sign language to communicate. Smith mentioned a couple of "odd" interactions with K.M. a few weeks after Appellant was arrested. In the first interaction, Smith recalled that he was sitting in a recliner watching television with K.M. when she abruptly grabbed Smith's head and tried to kiss him on the lips. Smith then "pushed" K.M. away and

corrected her behavior. Smith stated that K.M. appeared confused when he told her that this type of behavior "wasn't good."

Smith was concerned about the cause of K.M.'s behavior, so he asked K.M. about "what [Appellant] did to her," referring to Appellant as "that man" to avoid using Appellant's name. K.M. responded by pointing to Smith's "groin" and then pointing to her groin area.[4] Smith asked K.M. what else Appellant had done to her, and she then gestured to Smith's groin area a second time before pointing towards her mouth. Smith testified that because K.M. was nonverbal and did not know the meaning of the word "sex," he believed that K.M.'s gestures were her attempts to communicate to him the sexual trauma and abuse that Appellant had committed against her. In the second interaction, Smith observed K.M. mimicking "sexual acts" with her "baby dolls" when she was seven.

Mother testified that there were multiple occasions where Appellant had been alone with the children while they lived with (1) Appellant's sister and (2) Mother's uncle. Specifically, Mother recalled that Appellant would be alone with her children when he picked up Mother from work "in the middle of the night" and he would occasionally bring one or two of the children with him. Mother testified that, sometime after she and the children began living with her uncle, T.M. told her about a "concerning" incident he observed between Appellant and B.F. Mother testified that, while she did not report this incident to the police, she spoke to Appellant about T.M.'s allegations and Appellant responded that T.M. was "making it up." Mother also recalled another incident that she witnessed between Appellant and B.F. where Appellant took B.F. to the "pool room" in her uncle's house. Mother said that, after searching for B.F. in her uncle's house, she entered the pool room "turned on the

---

[4]The State provided notice to Appellant of their intent to use Smith as the outcry witness for K.M., and the trial court later determined at a pretrial hearing that Smith's outcry testimony was reliable. *See* CRIM. PROC. art. 38.072.

lights" and saw Appellant—with his pants down—while B.F. was "on all fours" under the pool table and Appellant was behind B.F. Mother stated that she did not contact law enforcement about the "pool room" incident because of previous "altercations" between her and Appellant where he had threatened to kill Mother if she reported him to the police.

Bishop testified that she and Mother were friends, she had a child who was around the same age as B.F., and she knew that Mother would leave the children alone with Appellant. Bishop testified that she was a victim of sexual abuse as a child, and she noticed "a lot of red flags" related to when Appellant was with the children, such as (1) changes in B.F.'s clothing, behavior, and demeanor once Mother began dating Appellant, (2) statements made by Bishop's daughter about Appellant's behavior after spending the night when Appellant was present, and (3) Bishop's general observations of Appellant's behavior toward B.F. Bishop further stated that she would avoid Appellant while visiting Mother's residence because he made Bishop and her husband "extremely uncomfortable."

B.F. testified at trial about approximately ten incidents of sexual assault committed by Appellant against her prior to July 2021, which began when she was twelve. B.F. described the "pool room" incident as well as other instances of sexual assault committed against her, which occurred when Appellant was alone with B.F. in his vehicle. According to B.F, Appellant would be alone with her and her siblings at various times during his relationship with Mother—both when they lived with Appellant's sister and Mother's uncle. B.F. stated that K.M. "struggle[d] with her speech" and could "[k]ind of" speak in complete sentences. B.F. testified that she was afraid of Appellant, and she did not make an outcry during her forensic interview because she was scared that Appellant would hurt her by "either having sex with [her], or "the gun." B.F. stated she believed that Appellant was waiting for her

9

outside of Harmony Home. However, B.F. testified that she later made an outcry to a law enforcement officer in a subsequent interview because she felt safe.

Deputy Heidi Zavala with the Ector County Sheriff's Office testified that she spoke to B.F. at the sheriff's office sometime after B.F. finished her forensic interview at Harmony Home. Deputy Zavala did not interview either K.M. or Z.M. during her investigation because they were nonverbal and "too little." According to Deputy Zavala, B.F. referred to Appellant as "KC" and described various instances of sexual abuse inflicted upon her by Appellant. Deputy Zavala testified that Appellant was "sitting outside" in a vehicle during B.F.'s interview at the Sheriff's office, but she did not know if Appellant was waiting outside of Harmony Home during either B.F.'s, Z.M.'s, or K.M.'s forensic interviews. Deputy Zavala also testified that during her investigation, she searched Appellant's vehicle; however, she did not collect any DNA evidence from it because of (1) the "dirty" condition of the vehicle, and (2) the time that had elapsed between the date her investigation commenced and when the sexual assaults occurred.

## II. *Standard of Review*

We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023).

When conducting a sufficiency review, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v.*

*State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Lee v. State*, 676 S.W.3d 912, 915 (Tex. App.—Eastland 2023, no pet.). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *See* CRIM. PROC. art. 36.13 (West 2007); *Garcia*, 667 S.W.3d at 762 ("[A] reviewing court does not sit as the thirteenth juror and may not substitute its judgment for that of the factfinder by reevaluating the weight and credibility of the evidence."); *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899; *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Garcia*, 667 S.W.3d at 761 (quoting *Jackson*, 443 U.S. at 319); *Clayton*, 235 S.W.3d at 778. Therefore, if the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Garcia*, 667 S.W.3d at 762; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Because the standard of review is the same, we treat direct and circumstantial evidence equally. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Ruiz v. State*, 631 S.W.3d 841, 851 (Tex. App.—Eastland 2021, pet. ref'd). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish the defendant's guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13); *Lee*, 676 S.W.3d at 915. Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, we

may not use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Rather, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

Finally, we measure the sufficiency of the evidence by the elements of the charged offense as defined by the hypothetically correct charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In this regard, to determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt under the *Jackson* standard, we compare the elements of the offense to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik*, 953 S.W.2d at 240). The hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

### III. *Analysis*

In his sole issue, Appellant challenges the sufficiency of the evidence to support his convictions for the aggravated sexual assaults against Z.M. and K.M. Specifically, Appellant contends that, while the evidence was sufficient to support his conviction for the aggravated sexual assault of B.F., the jury acted irrationally when it found the elements of Counts Three and Four beyond a reasonable doubt because: (1) neither Z.M. nor K.M. made an outcry of sexual abuse against Appellant; (2) no witnesses testified that they saw Appellant sexually abuse Z.M. or K.M.; (3) there is no evidence that Appellant intentionally or knowingly caused his penis, his finger, or an unknown object to penetrate the sexual organ of Z.M., or that he intentionally or knowingly caused Z.M.'s sexual organ to contact his penis, as

charged in Count Three; and (4) there was no evidence presented to show that Appellant intentionally or knowingly caused the sexual organ or mouth of K.M. to contact his penis, as charged in Count Four.

In response, the State argues that the cumulative force of all the evidence adduced at trial proved beyond a reasonable doubt that Appellant committed the offenses of aggravated sexual assault of a child against Z.M. and K.M.

As relevant to this case, a person commits the offense of aggravated sexual assault of a child if he intentionally or knowingly causes a child's sexual organ or mouth to contact his penis, and the child is younger than fourteen. PENAL §§ 22.021(a)(1)(B)(iii), (v), (a)(2)(B).[5] A person commits the offense of super aggravated sexual assault of a child if he intentionally or knowingly causes the penetration of the sexual organ of a child by any means, or causes the sexual organ of a child to contact his penis, and the child is younger than six. PENAL § 22.021(a)(1)(B)(i), (iii), (f)(1); *Gutierrez v. State*, 710 S.W.3d 804, 807 (Tex. 2025) ("Subsection (f) is an element of the offense of super aggravated sexual assault of a child."). Count Three of the reindictment alleged that Z.M. was younger than six when the sexual assault occurred, and that Appellant intentionally and knowingly penetrated the sexual organ of Z.M. by using either his penis, his finger, or an unknown object, or caused Z.M.'s sexual organ to contact his penis. Count Four of the reindictment alleged that K.M. was younger than fourteen when the sexual assault occurred, and that Appellant intentionally and knowingly caused K.M.'s sexual organ or mouth to contact his penis.

Under Article 38.072 of the Code of Criminal Procedure, a hearsay statement made to an outcry witness by certain victims of sexual abuse, including child victims

---

[5]As relevant to Count Three of the reindictment, if the victim of the offense "is younger than six years of age at the time the offense is committed," then the "minimum term of imprisonment for an offense under this section is increased to [twenty-five] years." PENAL § 22.021(f)(1).

13

of a sexual offense, is admissible. CRIM. PROC. art. 38.072; *see also Martinez v. State*, 178 S.W.3d 806, 814 (Tex. Crim. App. 2005) (noting that Article 38.07 deals with the sufficiency of evidence required to sustain a conviction for certain sexual offenses, while Article 38.072 concerns the admissibility of outcry evidence that would otherwise be barred by the hearsay rule); *Chapman v. State*, 349 S.W.3d 241, 245 (Tex. App.—Eastland 2011, pet. ref'd). The outcry witness is the first person who is eighteen or older, other than the defendant, to whom the child made a statement about the details of the sexual offense. CRIM. PROC. art. 38.072*; see Bays v. State*, 396 S.W.3d 580, 585 (Tex. Crim. App. 2013). "The [child's] statement must be 'more than words which give a general allusion that something in the area of child abuse is going on'; it must be made in some discernible manner and is event-specific rather than person-specific." *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011) (quoting *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990)). As such, a child victim's outcry statement(s) alone can be sufficient to support a sexual assault conviction. *See Jones v. State*, 428 S.W.3d 163, 169 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd); *Anaya v. State*, No. 11-17-00076-CR, 2019 WL 1428612, at *2 (Tex. App.—Eastland Mar. 29, 2019, no pet.) (mem. op., not designated for publication).

We note that Count Three of the reindictment alleged that Appellant penetrated Z.M.'s vagina with an unknown object. Based on this language, the State was only required to prove that Appellant penetrated the child's vagina by any means, and the State did not need to identify or offer proof of the unknown object that Appellant used to support the jury's determination of Appellant's guilt on Count Three. *See Coe v. State*, No. 14-10-00929-CR, 2012 WL 1899179, at *13 (Tex. App.—Houston [14th Dist.] May 24, 2012, pet. ref'd) (mem. op., not designated for publication) ("All the State was required to prove was that appellant penetrated [the

child's] vagina by any means, which could have been an unknown object and not appellant's sexual organ."); *see also Garcia v. State*, No. 11-12-00091-CR, 2014 WL 1778252, at *5 (Tex. App.—Eastland Apr. 30, 2014, no pet.) (mem. op., not designated for publication).

Appellant contends that the State failed to present any evidence that either Z.M. or K.M. made an outcry of sexual abuse. Appellant also contends that there is no evidence that he (1) used his penis, his finger, or an unknown object to penetrate Z.M.'s vagina as alleged in Count Three, or (2) caused his penis to contact K.M.'s vagina or mouth as alleged in Count Four. Appellant is mistaken as to each contention.

Here, the State provided notice to Appellant and the trial court about the State's intention to use Polanco and Smith as outcry witnesses. *See* CRIM. PROC. art. 38.072. Following this notice, the trial court held a hearing on the State's motion of the reliability of (1) Polanco's outcry testimony concerning Z.M., and (2) Smith's outcry testimony concerning K.M. After a hearing, the trial court determined that their outcry testimony was reliable, and both testified at trial.

Polanco testified that Z.M. made an outcry of sexual abuse by referring to an anatomical drawing and stated that "Tetta" had "touched" her vagina (which she referred to as her "leg") and Tetta was a "boy" who "lived in her house. According to Polanco, Z.M.'s outcry statements indicated that "Tetta" was a male, and not her brother, T.M., who lived in her home. Additionally, Mother testified about those who lived with her and the children in the past, and she stated that Appellant lived with them at various times and had unsupervised access to the children. Smith testified that he asked K.M. "what that man did to her," referring to Appellant, and K.M. responded by pointing to Smith's "groin" and her groin. Smith then asked K.M. what else had occurred between her and Appellant and she again gestured toward Smith's groin before pointing to her mouth. Smith testified that, even though

15

he did not use Appellant's name during this conversation, he believed that K.M. was expressly referring to the sexual trauma that she had experienced because of Appellant's sexual abuse. As such, regardless of whether Z.M. or K.M. understood the meaning of the terms "sex" or "penetration" when they made their outcry statements, the jury could have reasonably and logically concluded from the outcry testimony that (1) Appellant penetrated Z.M.'s vagina with an unknown object or caused Z.M.'s vagina to contact his penis, and (2) Appellant caused K.M.'s vagina or mouth to contact his penis. *See Rodriguez v. State*, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991) (explaining outcry witness testimony is substantive evidence of guilt for sufficiency review and is alone sufficient to support a conviction).

Moreover, even though corroboration of a child victim's testimony by medical or physical evidence is not required to support the jury's determination of guilt, the State nevertheless presented competent medical evidence of vaginal scarring and bruising on K.M. and Z.M. that were consistent with injuries one would receive from a penetrative sexual assault. *See Wishert v. State*, 654 S.W.3d 317, 328 (Tex. App.—Eastland 2022, pet. ref'd); *Martines v. State*, 371 S.W.3d 232, 240 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). The medical evidence showed that each child sustained physical injuries and trauma because of Appellant's sexual abuse. Dr. Anbarsvrri testified to observing trauma-based bruises on K.M.'s vaginal area during his examination of her, and he stated that these types of injuries were likely caused by penetrative sexual abuse rather than by other acts or means. Dr. Anbarsvrri believed that K.M.'s combative behavior during his examinations were consistent with persons who suffered from trauma that was attributable to sexual abuse and not from behaviors associated with Down syndrome. Similarly, Aguilar testified that she observed linear vaginal scars during Z.M.'s examination. Aguilar stated that Z.M.'s vaginal scars were (1) related to

16

"penetration," (2) "deeper than a regular laceration from consensual sex," and (3) like B.F.'s vaginal scars. As such, this physical evidence corroborated the outcry testimony.

Further, Schoen testified concerning the behaviors that are typically associated with children who have experienced trauma because of sexual abuse and the general behaviors exhibited by sexual predators who are attracted to children. Testimony was presented from several witnesses that they observed behaviors exhibited by K.M. and Z.M. that are consistent with the responses that are known to be expressed by child victims of sexual abuse, which included: (1) Smith's testimony that (a) K.M. exhibited inappropriate sexual behavior while living with him and his wife, (b) Z.M. would become "very angry" and "go into like a fit" if Appellant's name was mentioned during a conversation, and (c) Z.M. has "nightmares" every night and occasionally "wet[s]" the bed; (2) Dr. Anbarsvrri's and Aguilar's testimony concerning K.M.'s demeanor and conduct during their medical examinations; (3) Bishop's and Mother's observations of Appellant's abusive behavior toward the children; and (4) B.F.'s testimony that she was afraid of Appellant and the various instances of sexual abuse committed by him that she had experienced.

In this case, as in all cases, the jury may believe all, some, or none of any witness's testimony. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *Reyes v. State*, 465 S.W.3d 801, 805 (Tex. App.—Eastland 2015, pet. ref'd) (citing *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986)); *see Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. As the trier of fact, it is the jury's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 326; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899.

We have reviewed the evidence in the light most favorable to the jury's verdicts, and we conclude that the record before us contains sufficient evidence from which a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant committed the offenses of super aggravated sexual assault of Z.M. and aggravated sexual assault of K.M. as charged in Counts Three and Four of the reindictment, respectively. *See* PENAL § 22.021(a)(1)(B), (a)(2)(B), (f)(1); *Jackson*, 443 U.S. at 319; *Rodriguez*, 819 S.W.2d at 873.

Accordingly, we overrule Appellant's sole issue on appeal.

IV. *This Court's Ruling*

We affirm the judgments of the trial court.


W. STACY TROTTER

JUSTICE


January 15, 2026

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

18